UNITED STATES of America,
Plaintiff-Appellee,

v.

Lynne SIMON, Jean Martinez, Marilyn
Jacobs, and Carol Lindenberg,
Defendants–Appellants.

No. 86–5222.

United States Court of Appeals,
Eleventh Circuit.

March 15, 1988.

Milton E. Grusmark, North Miami, Fla., for Simon.

Sheryl J. Lowenthal, Coral Gables, Fla., for Martinez.

Robert Kalter, North Miami, Fla., for Jacobs.

William A. Meadows, Jr., South Miami, Fla., for Lindenberg.

Leon B. Kellner, U.S. Atty., Linda Collins-Hertz, Laura Wean Bonn, Andrea M. Simonton, David O. Leiwant, Asst. U.S. Attys., Miami, Fla., for U.S.

Before JOHNSON and EDMONDSON, Circuit Judges, and HOFFMAN *, Senior District Judge.

WALTER E. HOFFMAN, Senior District Judge:

Appellants were involved in a boiler room operation in which they sold oil and gas

---

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

leases. The appellants made representations by mail and over the phone concerning the leases. These representations usually came from scripts prepared by the appellants' supervisors, but often the appellants made representations on their own initiative. The United States Postal Service discovered that appellants' representations were false and that the boiler room operation was fraudulent. Consequently, the government indicted, *inter alia*, appellant salespersons on conspiracy and fraud charges under 18 U.S.C. sections 1341 and 1343.

After six weeks of trial, a jury returned guilty verdicts against all four appellants on both mail or wire fraud and conspiracy charges. All four appellants appeal the district court's refusal to grant a motion for judgment of acquittal on the ground that the evidence at trial did not show that the appellants intended to defraud. Three appellants appeal the admission into trial evidence of prior similar acts. Two appellants appeal the district court's refusal to grant their severance motions.

## FACTS

In September of 1982 the United States Department of Interior, Bureau of Land Management (BLM) made available lands for oil and gas leasing in the Denali area of Alaska. The leases were for ten years at a cost of one dollar per acre plus a onetime $75 filing fee. The minimum acreage available for leasing when the BLM opened the Denali area was 640 acres which the BLM increased to 2,560 acres in 1985. National Land Service, a private company, leased large parcels from the BLM and later sold some of its leases to Alaska Oil Leases (Alaska Oil), a partnership organized in August of 1983 by William Martin, Larry Waxman, Harvey Ganz and Michael Bonomo. The business of Alaska Oil was to sell oil and gas leases to the public through telephone solicitation. After purchasing

leases from the National Land Service for $50 per acre, Alaska Oil sold the leases for $250 to $300 per acre.[1] Of course, the challenge facing the partners at Alaska Oil was finding customers willing to pay between $250 and $300 per acre for leases worth about one dollar per acre. To accomplish this feat, Alaska Oil hired a staff of experienced telephone salespersons. The partners at Alaska Oil supplied the sales staff with the names and phone numbers of prospective customers along with prepared "scripts" from which the salespersons were to make their presentation and answer any customer objections.

The initial contact with the potential customer was dubbed the "front call." Its purpose was to explain the benefits of the investment, create interest on the part of the customer, and find out how much money the customer had available to invest. During the front call, salespersons told customers that, if they bought a lease from Alaska Oil, within six months the customer could sell the lease to an oil company at a large profit. According to Alaska Oil partner Harvey Ganz, the government's chief witness, the leases were never sold to any oil company. Furthermore, Ganz testified that the partners at Alaska Oil had no reason to believe oil companies would be interested in leases sold by Alaska Oil.

Following the initial contact, the salespersons sent a brochure to interested customers. On the cover of the brochure is a picture of an oil rig, along with the logos of several major oil companies. Ganz testified that Alaska Oil designed the cover to give the partnership an "aura of legitimacy" by creating the false impression that Alaska Oil was somehow associated with these companies. Included with the brochure were copies of articles clipped from nationally recognized publications. These articles refer to the vast oil potential of Alaska in Prudhoe Bay. According to Ganz, the articles were intended to convey the

---

**1.** Alaska Oil bought their leases from National Land Service for $2,000 per forty-acre, ten-year oil and gas lease. Harvey Ganz, testifying for the government, said he and his partners knew the same leases were available from the Bureau of Land Management for one dollar per acre, but decided that a bird in hand was worth the difference in price. According to Ganz, Alaska Oil would have to wait six months for any leases purchased from the Bureau of Land Management, while leases bought from National Land Service were available immediately.

concededly false impression that the Denali Basin had the same oil producing potential as Prudhoe Bay.

The salespersons recontacted potential customers seven to ten days after the customers received this brochure. The second contact was known as the "drive call." Like the front call, salespersons made the drive call from a script. The script for the second call stated that Alaska Oil was releasing "the most valuable leases in [its] inventory," when in fact, as the record makes clear, none of the leases were valuable, and none were of greater value than any other. The drive script also stated that the question was not whether there *was* oil and gas on Alaska Oil's land, but only a question of *how much*. The script further stated that exploration for the untapped oil should begin within six to eight months. Testifying for the government, Ganz stated that the partners at Alaska Oil had no idea when oil companies would begin exploration, and had no reason to expect such exploration. Ganz testified to numerous other false or misleading representations in the drive script which were intended to convey the impression that oil companies were spending billions of dollars exploring lands in the Denali Basin, and were trying to control the land Alaska Oil was selling.

Alaska Oil's sophisticated sales operation was not novel. Prior to forming Alaska Oil, all four partners worked at another telephone sales room which operated under the names of U.S. Oil and Gas, Eagle Oil and Stratford Company. These companies provided customers a chance to win an oil lease by selling them the right to participate in a lottery program offered by the federal government. The same person owned all three companies and the record suggests that the three were essentially one business operation. In an attempt to secure experienced sales personnel, the partners at Alaska Oil hired former employees of U.S. Oil and Gas, Eagle Oil and Stratford Company (hereafter U.S. Oil) to market their leases. All four appellants

were previously employed with one of these "three" companies.

In addition to hiring the same salespersons, Alaska Oil used the same sales techniques that were used at U.S. Oil. Specifically, salespersons at U.S. Oil, like those at Alaska Oil, were given names of potential customers on lead cards. The sales approach involved making multiple telephone calls to these potential customers. Scripts were written for salespersons to use in making these calls. Some of the scripts used by Alaska Oil salespersons were taken from the U.S. Oil operation and modified by the partners at Alaska Oil to fit the new program. When the partners formed Alaska Oil, the government had already begun investigating the U.S. Oil operation.[2] Shortly after Alaska Oil began marketing leases, all four partners were indicted for their activities at U.S. Oil. The record shows that the partners assured the appellants that Alaska Oil was a legitimate organization free from any illegalities that might plague any former boiler room operation with which they were involved.

Of course, as postal authorities discovered, Alaska Oil was just as fraudulent as the earlier operations. Through informants, the Postal Service planted "lead cards" in Alaska Oil's files. Eventually, a salesperson at Alaska Oil contacted a postal inspector, assuming he was a potential customer. The inspector recorded several calls from Alaska Oil. Subsequently, and apparently on the basis of the recorded calls, the Postal Service obtained a warrant and searched Alaska Oil's premises, seizing certain business records. In March of 1984 the government closed Alaska Oil and indicted fourteen persons including the partners Harvey Ganz and Michael Bonomo on mail and wire fraud and conspiracy charges. Also included in the fourteen persons indicted were appellant salespersons Lynne Simon, Jean Martinez, Carol Lindenberg and Marilyn Jacobs.

After six weeks of trial, a jury returned guilty verdicts against appellant salesper-

---

**2.** On cross-examination by the government, William Martin testified that, at the time he and his partners formed Alaska Oil, the government had

concluded its investigation of U.S. Oil and had indicted the four partners for their activities concerning U.S. Oil.

sons on both conspiracy and fraud charges.[3] In this appeal, all four appellants challenge the sufficiency of evidence at trial to show intent to defraud; appellants Simon, Martinez and Lindenberg challenge the admission into trial evidence of their employment with U.S. Oil; appellants Lindenberg and Jacobs challenge the trial judge's refusal to grant their motion for severance.

## I. SUFFICIENCY OF THE EVIDENCE

■ The jury below convicted each appellant on both conspiracy and mail or wire fraud charges. When reviewing verdicts challenged on a sufficiency of the evidence basis we must keep in mind the proper standard. We must view the evidence in a light most favorable to the government, drawing all inferences and resolving all credibility choices to support the verdict. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Plotke*, 725 F.2d 1303, 1306 (11th Cir.), *cert. denied*, 469 U.S. 843, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984). To reverse convictions, we must find that reasonable minds could not remove all reasonable doubt as to the defendants' guilt. *United States v. McCrary*, 699 F.2d 1308, 1311–12 (11th Cir.1983). Upon careful examination of the record below, we find the evidence sufficient to support the convictions.

### A. Fraud Charges

■ The indictment charges the appellants with either mail or wire fraud under 18 U.S.C. sections 1341 and 1343.[4] To convict a defendant of mail fraud, the court must find 1) intentional participation in a scheme to defraud a person of money or property, and 2) use of the mails in furtherance of the scheme. *United States v. Haimowitz*, 725 F.2d 1561, 1568–69 (11th Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984); *United States v. Hartley*, 678 F.2d 961, 985 (11th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). Similarly, to convict a defendant of wire fraud, the court must find use of a wire communication service in interstate commerce to further a scheme to defraud. *United States v. Griffin*, 699 F.2d 1102, 1105–06 (11th Cir.1983); *Banco de Desarrollo Agropecuario, S.A. v. Gibbs*, 640 F.Supp. 1168, 1175 (S.D.Fla. 1986).

In the instant case, Alaska Oil clearly was in business to defraud its customers. Both partners indicted for their activity in the operation plead guilty to conspiracy and fraud charges. In addition, several partners testified candidly at trial that they knew all along that Alaska Oil was a fraud. Indeed, the appellants do not challenge the jury's finding of a fraudulent scheme.

Likewise, the appellants do not challenge the court's finding of use of the mails or wire service in furtherance of the fraudulent scheme. For each substantive count in the indictment the appellants mailed to prospective customers a brochure explaining Alaska Oil's investment opportunities. In addition, the appellants made several calls to each client in an effort to market their employer's oil and gas leases. Such activity satisfies the "use of the mails" or "use of wire service" element necessary to convict a defendant under the statute. *See United States v. Martino*, 648 F.2d 367, 401 (5th Cir.1981) (defendant causes use of

---

3. Prior to trial, nine of the fourteen defendants entered guilty pleas. One codefendant has not joined this appeal.

4. Title 18 sections 1341 and 1343 of the United States Code read, in pertinent part:

§ 1341 Frauds and Swindles

Whoever, having devised or intending to devise any scheme or artifice to defraud ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... shall be fined not more than $1000 or imprisoned not more than five years, or both.

§ 1343 Fraud by wire, radio or television

Whoever, having devised or intending to devise any scheme or artifice to defraud ... transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1000 or imprisoned not more than five years, or both.

18 U.S.C. §§ 1341 and 1343.

mails when he acts with knowledge that mails will be used in ordinary course of business), *cert. denied*, 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982); *Banco de Desarrollo Agropecuario*, 640 F.Supp. at 1175 (one telephone call within jurisdiction in furtherance of fraud brings activity within statute).

The appellants' only contention is that they lacked the criminal intent necessary to convict them. *See United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir.1980) (defendant must have had conscious, knowing intent to defraud before court can convict him under statute). The appellants maintain that, while Alaska Oil was clearly involved in a fraudulent scheme, the appellants were unaware of the fraud. The record shows that the partners of Alaska Oil told the sales staff to rely on information in the sophisticated brochure and scripts when selling the leases. The appellants maintain that the information provided to them was carefully designed to hide any illegalities of the Alaska Oil enterprise. In essence, the appellants claim that they were the innocent dupes of Alaska Oil's management.

The appellants' contention might merit consideration had they not made representations to clients that went far beyond the information supplied by the partners at Alaska Oil. Although the scripts and brochure provided the appellants a wealth of half-truths on which to base representations, each appellant managed to go beyond the scripts to make wholly unfounded representations of their own. We find such representations provide considerable support for the jury's finding of criminal intent. We discuss these representations in turn.

**1. Lynne Simon.** The record shows that appellant Lynne Simon represented to her clients that Arco, a major oil company, bought a lease from Alaska Oil for $1 million and that the oil concerns of Getty and Texaco bought a lease from Alaska Oil

for $4 million. These representations go beyond both the brochure and scripts provided by the partners. While Alaska Oil's printed materials paint a picture of rich financial gain through the purchase of the partnership's oil leases, the materials make no reference to particular companies purchasing leases from Alaska Oil or to returns of several million dollars in lease rights for a mere $10,000 investment.[5]

According to the record, Simon also made representations concerning her experience and activities at Alaska Oil. She told her customers that she had been to Alaska and had actually seen oil "on the mountains" making up the customers lease. She further represented that she was head of research and development for Alaska Oil and had obtained "inside information" concerning the best oil leases through meetings she attended in Washington, D.C. The record shows, however, that Simon conducted only selling, not research and development, from a boiler room operation in Miami. Furthermore, the record contains evidence suggesting that Simon never went to Alaska or Washington, D.C. on business involving oil and gas leases.

**2. Jean Martinez.** The record shows that Jean Martinez represented to her clients that the leases available through Alaska Oil were more productive than those at Prudhoe Bay, a major oil-producing area of Alaska. She claimed that Arco had purchased an Alaska Oil lease for $20,000, and that Gulf Oil Company wanted to buy the leases, but was prohibited by federal government regulation. These representations are found in neither the brochure nor the scripts. The record reveals that major oil companies had purchased no leases from Alaska Oil nor had they shown any interest in the area of Alaska known as the Denali Basin, where Alaska Oil owned its leases. The scripts suggest that Alaska Oil's leases *may* have *half* the oil potential

---

**5.** The scripts provided to appellant salespersons make the representation that customers could make "large sums of money" by selling their leases to "big oil companies." The scripts further read that customers can make "thousands of dollars" in overriding royalties after selling the lease. Nothing in the scripts or brochure refers to specific gains a customer might make through Alaska Oil leases.

for producing crude as the Prudhoe Bay area.

Martinez further represented that certain customers at Alaska Oil were forming a private drilling group and that drilling already had begun on certain parcels. She told her clients that she would pick out for them a particularly valuable parcel next to a parcel that Martinez had purchased herself. The scripts and brochure make no mention of customer drilling groups or of drilling that had begun on any of Alaska Oil parcels. Indeed, the record shows that no individual, no oil company, and no customer groups have begun drilling anywhere in the Denali Basin. Finally, the record shows that the leases available through Alaska Oil had a market value of about $1 each and that Ms. Martinez made no purchases from Alaska Oil for any amount of money.

**3. Carol Lindenberg.** Carol Lindenberg's strategy for selling leases differed somewhat from her fellow salespersons. She made more representations to her clients about the credibility of Alaska Oil than about the leases themselves. These representations, however, were no less misleading. The record shows that Lindenberg told her clients that Alaska Oil had spent hundreds of thousands of dollars putting together the lease packages. She told her clients that she stumbled across Alaska Oil while looking for an investment opportunity for her family. Lindenberg represented that, after researching the company and its investment opportunities, she joined the company because she discovered Alaska Oil's leases were the best investments available. The scripts and brochure make no mention of the cost of this program to Alaska Oil. According to the record, anyone could buy the leases sold by Alaska Oil from the Bureau of Land Management in Alaska for $1 per acre. The record also shows that the partners of Alaska Oil hired Lindenberg because of her experience as a telephone salesperson. Nothing in the record either contradicts this motivation for hiring Lindenberg or supports Lindenberg's representation that she "discovered" Alaska Oil while searching for a good investment.

Lindenberg told her clients that she was receiving geological reports daily confirming the oil potential of the Denali Basin. While the brochure gives the impression that a reputable geological firm recommended the Denali Basin as a potential oil-producing area, there is no support in either the brochure, the scripts or the record below suggesting that Alaska Oil was receiving daily geological reports.

Finally, Lindenberg told her clients that she did not make money until the client made money. The record shows that Lindenberg, like all salespersons at Alaska Oil, was paid a commission based on the number of leases she sold. There is no evidence in either the record or the prepared scripts and brochure suggesting that salesperson compensation was linked to customer gain.

**4. Marilyn Jacobs.** According to the record, Marilyn Jacobs represented to her clients that the leases Alaska Oil had would be worth $100,000 by Christmas, a few months from the day she sold the lease to her client. She claimed that Alaska Oil was selling every other lease, giving the impression that the company was keeping half the investments for itself. Of course, the leases were not worth $100,000 and nothing in the brochure or script suggested this specific price. The record suggests that Jacobs knew Alaska Oil was selling every lease it could acquire.

Jacobs represented to her clients that she had visited the leases available through Alaska Oil and that there were capped wells on them. Nothing in the record shows that Jacobs was authorized to tell her customers that there were capped wells on the land in the Denali Basin. In addition, the record suggests that Jacobs never left her boiler room post in Miami to visit the Denali Basin. In sum, the record below makes clear that each appellant made representations that were not reflected in the written material provided by the management.

██ At least one appellant argues that, even if they did exceed the provided information, the appellants' representations do

not evidence an intent to defraud, but were merely "puffery." The appellants' argument is unpersuasive. In *United States v. New South Farm & Home*, 241 U.S. 64, 36 S.Ct. 505, 60 L.Ed. 890 (1916), the Supreme Court made the distinction between "puffing" and false representation. The defendant in *New South* was charged with mail fraud for misrepresentations concerning land he was selling in Florida. After finding that much of what the defendant represented was false, the lower court nevertheless held that the representations were mere "puffery." The Supreme Court reversed on appeal, and noted:

> [P]uffing, indeed, might not be within [the statute's] meaning ... that is, the mere exaggeration of the qualities which the article has; but when a proposed seller goes beyond that, assigns to the article qualities it does not possess, does not simply magnify in opinion the advantages and falsely asserts their existence, he transcends the limits of "puffing" and engages in false representations and pretenses.

241 U.S. at 71, 36 S.Ct. at 507. In the instant case, each appellant went beyond merely exaggerating the qualities of the leases as expressed in the scripts and brochures. The appellants "created" advantages by placing otherwise general assertions about the value of the leases into a concrete, factual setting. The appellants made the leases more than "very valuable", they made them worth $20,000 to $4 million; the appellants represented that oil companies were not merely interested in the leases, but that Arco, Getty and Texaco had paid millions of dollars for the leases; the appellants represented not only that the leases had oil potential, but that the appellants had seen the oil or wells on the land and that drilling had already begun. These representations are not opinions. They are either true, or they are false. In the instant case, the record makes clear that they are false, and therefore are mis-

representations evidencing an intent to defraud and not mere puffery.

Finally, citing *United States v. Pearlstein*, 576 F.2d 531 (3rd Cir.1978), the appellants contend that, even if they made independent misrepresentations amounting to fraud, the appellants' were nevertheless ignorant of the overall scheme and thus shielded from liability under the indictment. In *Pearlstein*, a jury convicted defendant salesmen of mail fraud based on misrepresentations concerning a writing pen distributorship. *Id.* at 533–34. While conceding the existence of an overall scheme to defraud, the salesmen maintained that they were ignorant of the scheme. *Id.* at 540–41. The Third Circuit reversed their convictions, noting that "[a]lthough ... a separate scheme to defraud could have been hatched by these salesmen within the overall scheme, such individual schemes were neither alleged nor proven by the Government in this case." *Id.* at 545 (citations omitted).

The Third Circuit's reasoning in *Pearlstein* is persuasive, but inapplicable to the instant case. If the jury below had convicted the appellants based on individual misrepresentations which were unrelated to the overall scheme, then *Pearlstein* may control.[6] Upon a close examination of the record, however, we find sufficient evidence to support the jury's conclusion that the appellants not only knew of the underlying scheme, but, as developed fully below, actually conspired to execute the scheme. Such knowledge supplies the "intent" element necessary to uphold the appellants' convictions.

**B. Conspiracy**

■ The jury below also convicted the appellants of conspiracy to commit fraud, a separate offense from the substantive crimes of mail and wire fraud. *Bannister v. United States*, 379 F.2d 750, 753 (5th

---

6. The indictment in the instant case, like the one in *United States v. Pearlstein*, 576 F.2d 531 (3rd Cir.1978), clearly charges the defendants with the overall conspiracy. If the defendants had no knowledge of the overall conspiracy, but merely made misrepresentations on their own,

then *Pearlstein* would be on point. We find, however, that the evidence supports the conclusion that the defendants participated in the overall scheme. Consequently, we need not decide whether this circuit adopts the Third Circuit's conclusions in *Pearlstein*.

Cir.1967), *cert. denied,* 390 U.S. 927, 88 S.Ct. 861, 19 L.Ed.2d 988 (1968). To convict a defendant of conspiracy to commit fraud, the court must find 1) an agreement to execute a scheme to defraud, and 2) use of either the mails or wire service in furtherance of the scheme. *See United States v. Sawyer,* 799 F.2d 1494, 1501–02 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987) (mail and wire fraud); *United States v. Sarro,* 742 F.2d 1286, 1293 (11th Cir.1984) (mail fraud); *United States v. Wieschenberg,* 604 F.2d 326, 331 (5th Cir.1979) (mail fraud); *United States v. Cowart,* 595 F.2d 1023, 1034 (5th Cir.1979) (wire fraud). As with the substantive charges, the appellants' defense to the conspiracy charge is that they lacked the criminal intent necessary to convict them on either substantive or conspiracy counts.

▪ The record below contains no evidence of an expressed agreement by the appellants to join the Alaska Oil fraud. The law makes clear, however, that "participation in a conspiracy need not be proved by direct evidence ... A common purpose or plan may be inferred from the evidence of a scheme." *United States v. Cole,* 755 F.2d 748, 755 (11th Cir.1985). A conspiracy by its very nature is secretive and "requires the trier of fact to infer its existence from the surrounding circumstances." *Hartley,* 678 F.2d at 972. In the instant case, the evidence supporting the appellants' knowledge of a conspiracy is sufficient to sustain the verdict.

First, the appellants made representations they *knew* were false regardless of what their superiors told them or what was written in the scripts and brochure. All four appellants represented that, upon closing a sale, they would "go over to allocations and pull out this 40 acre parcel [which is] without doubt as valuable as any lease in [the] inventory." Granted, every lease sold was as valuable as any lease in Alaska Oil's inventory since all the leases were

worth about one dollar. But the appellants knew that Alaska Oil had no allocations department. Harvey Ganz testified that, when a salesperson sold a lot, the salesperson merely removed a piece of cardboard from the wall where the cardboard indicated which leases were still available. Similarly, appellant Simon knew she was not part of Alaska Oil's fictitious "research and development" section; appellant Lindenberg knew Alaska Oil was not receiving daily geological reports; and appellant Jacobs knew Alaska Oil was selling every lease it had—not saving half of the leases for itself.

Next, the record contains evidence suggesting that the appellants attempted to hide from customers the ongoing investigations of U.S. Oil and Alaska Oil. The record shows that all four appellants knew the government was investigating U.S. Oil.[7] When customers asked about their investment with the former operation, some of the appellants were careful not to mention the government investigation. Appellant Simon told her client that the government had imposed some sort of regulation delaying the customer's investment. Simon never mentioned the government investigation of U.S. Oil. When a customer confronted appellant Martinez with a Wall Street Journal article criticizing U.S. Oil, Martinez intimated that the article was untrue and that U.S. Oil was managed by "fine people." Martinez never mentioned the government investigation or the indictment of the principals at U.S. Oil. In addition, in an effort to secure a replacement check, Martinez told a customer that his original check was destroyed in an accidental fire when the record shows that the check was in fact seized by government agents during a warranted search of Alaska Oil's premises.

Finally, all four appellants worked in a telephone boiler room with U.S. Oil. The record shows that when the appellants began working for Alaska Oil, they knew

---

7. The record shows that the government's investigation of U.S. Oil and subsequent indictment of the principals in the operation was public knowledge. In addition, the appellants claim in their defense that they specifically asked whether the Alaska Oil operation was above board. The record makes clear that the appellants' knowledge of the investigation and indictments issued concerning U.S. Oil motivated the appellants inquiring as to Alaska Oil's legality.

U.S. Oil was under investigation and that the government had indicted some of Alaska Oil's partners in connection with their activities at U.S. Oil. The record also shows that the appellants used pseudonyms while working at both U.S. Oil and Alaska Oil. This evidence, together with the evidence of the appellants' misrepresentations outside of the scripts and brochure, provides ample support for the jury's conclusion that the appellants intended to join a conspiracy and ultimately to defraud the customers of Alaska Oil.[8]

## C. Reckless Disregard of the Truth

■ Even if the appellants had never made representations beyond what their supervisors told them or wrote for them, the requisite "criminal intent" still would exist in this case, allowing the jury to convict the appellants for both conspiracy and fraud. Most reasonable persons would question the possibility of investing a mere $10,000 for a risk-free return of several times that amount in less than a year. The record shows that each appellant represented that clients could sell their $10,000 leases to oil companies for between $20,000 and several million dollars in less than six months.

If the unbelievable return on the investment did not alert the appellants of problems with Alaska Oil's leases, customer inquiries certainly did. One customer told Simon about a newspaper article concerning Miami companies under investigation for selling fraudulent Alaskan oil leases. Simon claimed she was unaware of any investigations. Another customer told appellant Martinez that postal inspectors had informed the customer that the oil leases Martinez sold were worthless. Martinez simply denied the report. Even after postal authorities had searched Alaska Oil's premises, Martinez was still trying to sell leases claiming she had no reason to suspect foul play. Another customer reported to Lindenberg that the customer's attorney told her that Alaska Oil offered a "phony deal." Lindenberg simply denied the attorney's assessment. Finally, a customer told appellant Jacobs that the customer had learned that the BLM sold Alaska Oil's lease land for one dollar per acre. Jacobs merely assured the customer that Alaska Oil had paid more for the land.

Each of these customer inquiries, when considered with the appellants' knowledge of the government's investigation of U.S. Oil, and the unbelievable profitability of the lease investment, should have raised a question in the appellants' minds about the legitimacy of the leases they sold for Alaska Oil. To ignore this question amounts to a reckless indifference to the truth, which supplies the criminal intent necessary to convict the appellants in this case. *Sawyer*, 799 F.2d at 1502; *United States v. Frick*, 588 F.2d 531, 536–37 (5th Cir.), *cert. denied*, 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 385 (1979). We refuse to allow the appellants to turn their backs on obviously suspicious circumstances while making commissions on sales to customers who are unaware of those circumstances.[9]

---

**8.** The weight of the evidence distinguishes this case from *United States v. Parker*, 839 F.2d 1473, decided today. In *Parker*, the defendants sold government-backed securities for a legitimate Florida brokerage house. At a manager's meeting, the president of the firm introduced a new short-term security backed by long-term treasury bonds. The defendants sold the security, representing to clients that the investment was "government backed." The president of the firm, however, failed to purchase the bonds to collateralize the security. Reversing jury verdicts against the defendants on mail fraud and conspiracy charges, we held that evidence of the defendants' attendance at the manager's meeting where the president introduced the fraudulent security was insufficient to uphold their convictions. The record in *Parker* contained no evidence that the defendants knew or could have known that the securities they were selling lacked sufficient backing. By contrast, the evidence inculpating the appellants in the instant case, as developed fully in the text, is more than adequate to allow a jury to convict the appellants.

**9.** Unlike the appellants in *United States v. Parker*, the appellants in the instant case were alerted to the possible illegalities in their sales operation. In *Parker*, on the other hand, the appellants had no reason to suspect that the securities they were selling lacked sufficient collateral. The president of the fraudulent company in *Parker* told his brokers that the securities they were selling were sufficiently backed by several million dollars worth of treasury bonds kept in

## II. EVIDENCE OF PRIOR ACTS

Appellants Lindenberg, Martinez and Simon maintain that the district court committed reversible error in admitting testimony of the appellants' employment at U.S. Oil. During the trial below, the government introduced testimony that each appellant worked at either U.S. Oil and Gas, Eagle Company or Stratford Company. This testimony contains evidence suggesting that some of the appellants were instrumental in accomplishing a fraud on the customers of the former companies. The government, however, did not argue that the appellants had the requisite intent to characterize their actions at U.S. Oil as criminal. The government claims it sought to introduce evidence of the appellants' "prior acts," i.e. their mere participation, however, innocent, in the scheme at U.S. Oil.

Before a district court can admit evidence of an appellant's prior acts, the prosecution must convince the court that 1) there was a proper purpose for introducing the evidence, 2) the appellants actually did the prior acts and 3) the probative value of introducing the evidence outweighs any prejudicial effect the evidence might have. *United States v. Roe*, 670 F.2d 956, 967 (11th Cir.), *cert. denied*, 459 U.S. 856, 103 S.Ct. 126, 74 L.Ed.2d 109 (1982); *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir.), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1978). The propriety of the lower court in admitting this evidence turns on the purpose for which the "prior acts" were introduced. The appellants contend that the government introduced their participation in the U.S. Oil scheme simply to show that they "acted in conformity therewith" at Alaska Oil. Rule 404(b) of the *Federal Rules of Evidence* makes clear that a court cannot admit evidence of a prior act to show that the defendant acted similarly. Fed.R.Evid.

404(b); *see United States v. Chilcote*, 724 F.2d 1498, 1501 (11th Cir.), *cert. denied*, 467 U.S. 1218, 104 S.Ct. 2665, 81 L.Ed.2d 370 (1984). The government, on the other hand, contends that the prior act evidence introduced at trial merely showed that the appellants knew of the government investigation of U.S. Oil and of the indictment of several employees at the company. Thus, the government argues, the court properly admitted evidence of the appellants' prior acts to help establish intent to commit the present crime. *See United States v. Dothard*, 666 F.2d 498, 501–02 (11th Cir.1982) (discussing proper purposes for admitting prior act evidence). Evidence that the appellants knew of the government investigation and subsequent indictment of employees for fraud at U.S. Oil is certainly relevant since the evidence helps to determine whether the appellants had the requisite intent to defraud in the instant case. *See* Fed.R.Evid. 401; *Dothard*, 666 F.2d at 501–02. Since the government has shown a proper purpose for introducing the prior acts, the evidence is relevant.

Relevance, however, is not the only consideration when determining the admissibility of prior acts. Before the trial court can admit such acts or any other evidence, the court must determine that the probative value of the evidence outweighs its prejudicial effect. Fed.R.Evid. 403; *Dothard*, 666 F.2d at 501. This determination is left to the sound discretion of the trial judge and will be reversed only upon a showing that the judge below abused his discretion. *Dothard*, 666 F.2d at 501. The appellants have made no such showing in the instant case.

Finally, as a predicate to the introduction of evidence of prior acts, the government must prove that the appellants actually committed the acts. *See Dothard*, 666 F.2d at 501. The appellants contend that the government never proved that the ap-

the company vault in Mississippi. The only way the appellants in *Parker* could check the backing of the securities was to travel to Mississippi and count the bonds in the company vault. In *Parker,* we refused to hold brokers criminally liable for failing to confirm representations made to them by their superiors.

In the instant case, however, the appellants had every reason to suspect foul play and had ample opportunity to verify their representations by simply contacting the Bureau of Land Management in Alaska.

pellants committed "bad acts" at U.S. Oil. The government, however, is less interested in possible bad acts of the appellants than in their mere participation in the previous boiler rooms and in their knowledge of the government investigation and indictment of employees at that boiler room. That appellants all worked at U.S. Oil is without question. The record is less clear as to whether each appellant knew of the government's investigation of U.S. Oil. The record does contain evidence that the investigations were "public knowledge." Also, in their defense, the appellants contend that they asked the partners about the legality of Alaska Oil in view of the fact that those partners had been indicted on fraud charges for activities at U.S. Oil. From this cumulative evidence, a reasonable juror could conclude that the appellants knew of the government investigation and indictment of employees at U.S. Oil. Consequently, we find that the trial court properly admitted evidence of the appellants' participation in prior boiler room activities for the purpose of helping establish the appellants' intent to commit fraud in the instant case.

## III. SEVERANCE

▇▇▇▇ Appellants Lindenberg and Jacobs contend that the district court erred in failing to grant the defendants' motion for severance. Rule 8(b) of the Federal Rules of Criminal Procedure makes clear that joinder of the defendants for trial is proper where the indictment charges multiple defendants with a single conspiracy and also charges some of the defendants with substantive counts arising out of the conspiracy. *See* Fed.R.Crim.P. 8(b); *see also United States v. Meester*, 762 F.2d 867, 883 (11th Cir.), *cert. denied*, 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985); *United States v. Alvarez*, 755 F.2d 830, 857 (11th Cir.), *cert. denied*, 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985); *United States v. Zielie*, 734 F.2d 1447, 1463 (11th Cir. 1984), *cert. denied*, 469 U.S. 1189, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). Rule 14, however, provides relief from prejudicial joinder via a motion for severance. Fed.R. Crim.P. 14. The decision to grant a motion

for severance lies within the sound discretion of the trial judge. *United States v. Sans*, 731 F.2d 1521, 1533 (11th Cir.1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 791, 83 L.Ed.2d 785 (1985); *United States v. Alberti*, 727 F.2d 1055, 1060 (11th Cir.), *cert. denied*, 469 U.S. 862, 105 S.Ct. 199, 83 L.Ed.2d 131 (1984). When making the decision to grant a severance, the trial court must balance the right of the defendant to a fair trial against the public's interest in the efficient and economic administration of justice. *United States v. Pepe*, 747 F.2d 632, 650–51 (11th Cir.1984); *Zielie*, 734 F.2d at 1464. Considerations of judicial economy are especially pertinent in this case where the trial below lasted over six weeks and involved the same witnesses testifying against each defendant. Of course, we cannot elevate considerations of judicial economy to the point where they interfere with the appellants' constitutional rights. If the appellants can show that the lower court abused its discretion in refusing to grant the motion for severance, we will reverse the convictions. *United States v. Taylor*, 792 F.2d 1019 (11th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1958, 95 L.Ed.2d 530 (1987); *United States v. Esle*, 743 F.2d 1465, 1476 (11th Cir.1984). To establish an abuse of discretion, the defendants must show that they suffered specific and compelling prejudice as a result of the denial of severance. *United States v. Van Horn*, 789 F.2d 1492, 1505 (11th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986); *Pepe*, 747 F.2d at 651; *Zielie*, 734 F.2d at 1464; *United States v. Walker*, 720 F.2d 1527 (11th Cir. 1983), *cert. denied*, 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984). Appellant Lindenberg contends that the spillover effect of testimony concerning codefendants amounts to "compelling prejudice" and thus justifies reversing her conviction. Specifically, Lindenberg cites as prejudicial testimony concerning her codefendants' prior "bad acts" at U.S. Oil.

▇▇▇ In *United States v. Zicree*, 605 F.2d 1381 (5th Cir.1978), this court made clear that a denial of severance is proper as long as jurors could "collate and apprize

the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct." *Id.* at 1389. A judge need not grant the motion for severance even if the jury's task of distinguishing the evidence is a difficult one. *Id.* Since the record does not reflect issues or evidence in this case too complicated for proper jury consideration, we find the "spillover effect" does not amount to compelling prejudice.

Appellant Lindenberg further asserts that testimony concerning her codefendants' many misrepresentations unduly prejudiced the conduct of her defense. The record makes clear that many of the misrepresentations made were unique to one appellant. Thus, while Lindenberg did not necessarily make the same misrepresentations, that Simon or Martinez made, the reverse is also true: Simon and Martinez did not make the same misrepresentations that are unique to Lindenberg. The appellant essentially argues that severance is required in all fraud cases unless the misrepresentations by each defendant are identical. We disagree. As long as the jury understands which defendant made which misrepresentation, severance is unnecessary. The record shows that the trial judge specifically instructed the jury to consider acts or statements only against the defendants involved and, therefore, severance was unnecessary.

Appellant Jacobs claims as prejudiced the introduction at her trial of detrimental testimony elicited on cross-examination of a codefendant's witness. Jacobs maintains that, had the lower court granted her motion for severance, the prejudicial testimony never would have reached the jury. Even assuming the allegedly prejudicial evidence would not be in the record had the defendants been tried separately, appellant Jacobs has not met the burden of showing compelling prejudice. Jacobs simply has shown that she was forced to overcome an added burden because she was tried with codefendants. The Constitution, however, does not guarantee the defendant a trial free from certain burdens that inevitably accompany a trial involving numerous defendants; the Constitution merely requires

that the court minimize the potential for transferring guilt. *Martino*, 648 F.2d at 385–86. We find the district court's instructions to the jury provided the necessary safeguards against the possibility of undue prejudice.

For the foregoing reasons, we conclude that the district court made no error and the jury verdicts accordingly are AFFIRMED.