UNITED STATES of America,
Plaintiff–Appellee,

v.

Russell Dewey SMITH, Sr.,
Defendant–Appellant.

No. 90–8623.

United States Court of Appeals,
Eleventh Circuit.

June 19, 1991.

Daniel M. Roper, Rome, Ga., for defendant-appellant.

Robert F. Schroeder, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before KRAVITCH and CLARK, Circuit Judges, and GODBOLD, Senior Circuit Judge.

CLARK, Circuit Judge:

Appellant Smith was convicted on three counts of mail fraud[1] and one count of conspiracy to commit mail fraud after participating in a scheme that involved staging an automobile accident, feigning an injury, and collecting $450 from State Farm Insurance Company. Smith was not personally at the scene of the "accident" but was taken to a hospital emergency room for treatment of the claimed injuries. Smith's co-conspirators told police that he had been taken to the hospital by a passer-by. We find that the evidence was insufficient to support the substantive convictions for mail fraud. We affirm Smith's conspiracy conviction.

## I.

The government's contention that Smith committed the substantive offense of mail fraud arises solely from the fact that, following Smith's receipt in person of a claims draft from the local State Farm agent, an "accounting copy" of the draft was mailed to State Farm's regional headquarters in Tallahassee, Florida.[2] According to testimony at trial, if the regional headquarters did not receive this account-ing copy, the headquarters would not give approval to its bank to pay the draft. In such a case, the bank that had cashed the draft prior to approval would be left with the loss.

This circuit has defined the offense of mail fraud as consisting of:

(1) an intentional participation in a scheme to defraud a person of money or property, and (2) the use of the mails in furtherance of the scheme. The latter element is satisfied if the scheme's completion was dependent in some way upon information and documents passed through the mails and if the defendant acted with knowledge that the use of the mails would follow in the ordinary course of business or could reasonably be foreseen.[3]

We are satisfied that Smith intentionally participated in a scheme to defraud State Farm. But we are not confident that the government proved that the fraud depended upon the use of the mails or that the mails were knowingly or foreseeably used.

### A. Dependence Upon the Mails

Whether Smith's fraud depended upon the mails is a difficult question. The Supreme Court has held that "[t]o be part of the execution of the fraud, ... the use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be 'incident to an essential part of the scheme,' or 'a step in [the] plot.'"[4] In this case, Smith obtained the claims draft by hand-delivery and then deposited the draft in his bank account. Although the government claimed the draft would not be paid until State Farm's bank received confirmation as a result of the mailing of the accounting copy, the evidence is unclear as to whether the amount of the draft was immediately credited to Smith's account or was held pending notification

1. 18 U.S.C. § 1341.

2. R1-1-4-5 (indictment).

3. *United States v. Downs*, 870 F.2d 613, 615 (11th Cir.1989) (citations and footnote omitted).

4. *Schmuck v. United States*, 489 U.S. 705, 710–11, 109 S.Ct. 1443, 1447, 103 L.Ed.2d 734 (1989) (citations omitted).

from State Farm's bank that the funds should be released.[5] The State Farm agent testified that Smith's bank could have credited Smith's account prior to receiving confirmation of the draft's authenticity, although Smith's bank would have been responsible for any losses caused by the premature acceptance.[6]

The cases indicate that, if a defendant has been able to take possession of the object of the fraud and if the fraud is then at an end, further mailings "involve[ ] little more than post-fraud accounting among the potential victims of the various schemes, and the long-term success of the fraud [does] not turn on which of the potential victims [bears] the ultimate loss."[7] We similarly find it immaterial whether State Farm or Smith's bank bore the loss as a result of the fraud.

Although it may have been the case that Smith's bank did not credit Smith's account until the accounting copy of the draft passed through the mails and State Farm's bank released the funds, the government failed to introduce evidence showing beyond a reasonable doubt that Smith could not have taken possession of the money *before* State Farm's bank released the funds as a result of its receipt of the accounting copy of the draft. Smith's conviction for the substantive violation of the mail fraud statute must be reversed, because the mailing was not proven to be necessarily " 'incident to an essential part of the scheme,' or 'a step in [the] plot.' "[8]

## B. *Knowing or Foreseeable Use of the Mails*

Even if the scheme had depended upon the mailing of the accounting copy of the draft, the government failed to show that Smith knew or should have foreseen that the mails would actually be used. The testimony of the State Farm agent who handed Smith the claims draft indicates that the agent did not tell Smith that an accounting copy of the draft, or any other kind of information, would be sent through the mails.[9] And the agent testified that drafts "basically resemble" checks.[10] There was no evidence that Smith was familiar with the internal operations or accounting procedures of insurance companies. Indeed, testimony at trial showed that Smith cannot read.[11] We are therefore unable to conclude that Smith had actual knowledge of the mailing of the accounting copy of the draft.

In rejecting this contention, the district court stated:

Mr. Smith was sophisticated enough in the workings of the insurance industry to coordinate an elaborate scheme to defraud State Farm. This scheme took more than a passing knowledge of the workings of the insurance business. There is little doubt that Mr. Smith knew that State Farm was a national corporation with offices throughout the country. Moreover, the draft issued to Mr. Smith indicated that it was payable through a bank located in Jacksonville, Florida. Therefore, from the face of the draft itself, it is apparent that Mr. [S]mith

---

**5.** *See* R2–115–16 (testimony of State Farm agent).

**6.** R2–115 (cross-examination of State Farm agent by Smith's attorney):

Q Is it possible that somebody could cash one of those [drafts] at a bank without having authorization from State Farm?
A It would be up to the individual bank. It could be done, I assume, but the bank will not receive its money until due process has been through.
Q So the possibility, it's the bank's decision they make, they can make the payment, but if the State Farm during their internal process for some reason rejects that draft, then the bank may not get paid by State Farm. Is that right?

A That's correct.

**7.** *Schmuck,* 489 U.S. at 714, 109 S.Ct. at 1449.

**8.** *Cf. Kann v. United States,* 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944) (schemers cashed fraudulently drawn checks; convictions reversed because fraud had reached fruition).

**9.** R2–113–14.

**10.** R2–114 ("[Drafts] basically resemble a check, however, instead of a check, they say payable through, which any bank teller when you present one to them immediately knows that it is a draft instead of a check.").

**11.** R2–120.

would have known that the draft had to go through the mails.[12]

From our review of the trial transcript, we disagree with the district court's conclusion that Smith "coordinate[d] an elaborate scheme to defraud State Farm." The government never contended that Smith had any part in coordinating the scheme. Smith was recruited by the organizer of the fraud, LeBron Beene, and seemed to have played an essentially passive role. As the prosecutor put it in his opening statement to the jury, "You'll hear how Lebron Beene asked Russell Dewey Smith, Sr. if Russell Dewey Smith [Sr.] would like to participate in this scheme, and you'll hear how Mr. Smith voluntarily agreed to participate in this scheme to defraud State Farm."[13] We therefore find no support in the record for the district court's deduction that Smith had "more than a passing knowledge" about the insurance industry. Also, Smith's knowledge of whether the draft itself would pass through the mails is immaterial, as the government never alleged that the draft was mailed.

We also find that the use of the mails was not reasonably foreseeable. The fact that State Farm mails accounting copies of drafts it issues is not common knowledge by any stretch of the imagination.

The district court found that the mailings were foreseeable, stating:

> [T]he Federal Reporters are full of cases in which the courts have found that mailings between field agents and their home office is [sic] reasonably foreseeable to those parties attempting to perpetrate fraud. *See United States v. Flemino*, 691 F.2d 1263, 1265 (8th Cir.1982)

(and cases cited therein). There is simply no creditable evidence that would lead this Court to conclude that Mr. Smith did not know or could not reasonably foresee that State Farm would use the mails in processing his draft.[14]

█ The cases cited by the district court involving mailings between insurance agents and their home offices have no application in Smith's case. For example, the mailings in *Flemino* were described as follows: "Some mailings were from the agent to the home office, others were mailings of the actual policies from the regional office to the agent, and one was a claim file report sent by the field claims specialist to the home office."[15] We agree that it is foreseeable that communications involving the policy, the details of the claim, or requests for the payment of the claim would be mailed.[16] But the substantive counts of Smith's indictment did not allege such mailings, but only mailings of accounting copies of drafts. And no evidence was introduced to show that "reasonable people" would foresee the mailings of accounting copies of drafts that had been issued. We do not believe the bare fact that large organizations mail communications between offices brings every fraud against such entities within the federal mail fraud statute.[17] In this case, the government was required by the narrowly drawn indictment to show that mailings of accounting drafts were reasonably foreseeable, and it did not.

## II.

█ Smith was convicted on two counts for the actions of his co-conspirators in

12. R1–20–9.

13. R2–10.

14. R1–20–10.

15. *Flemino*, 691 F.2d at 1264–65.

16. *See also United States v. Calvert*, 523 F.2d 895, 900 n. 2 (8th Cir.1975) (detailing mailings between insurance agent, home office, and defendant used to support mail fraud conviction), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976); *Bannister v. United States*, 379 F.2d 750, 752–53 (5th Cir.1967) (affirming

mail fraud convictions; "The mailings involved ... were confined to the inter-office communications requesting approval of the application and payment of the claim between the Jacksonville agency and the home office in New York."), *cert. denied*, 390 U.S. 927, 88 S.Ct. 861, 19 L.Ed.2d 988 (1968).

17. *See generally Kann*, 323 U.S. at 95, 65 S.Ct. at 151 ("The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law.").

causing accounting copies of drafts to be mailed. The government did not show that Smith's co-conspirators knew or should have foreseen the mailings of the accounting copies.[18] The most the government showed was that it was foreseeable that information concerning the claim itself would have to be sent through the mails.[19] Smith's convictions on these counts cannot stand.

## III.

Smith was convicted on one count for his participation in a conspiracy to commit mail fraud.[20] In addition to the mailings of the accounting copies, the government alleged that the conspirators committed other overt acts, including causing the mailings of physicians' reports and medical bills for co-conspirator LeBron Beene between the insurance agent and the health care providers. The government introduced evidence at trial showing that such mailings were made.[21]

Smith contends that this circuit's precedents require the government to show that the conspirators specifically intended to violate the mail fraud statute. For example, in *Bannister v. United States*[22] this court noted, "The substantive mail fraud counts must be distinguished from a charge of conspiracy which, being an agreement, calls for proof of an intended use of the mails."[23] However, *United States v. Simon*[24] held (without discussing the above-cited precedent), "To convict a defendant of conspiracy to commit mail fraud, the court must find 1) an agreement to execute a scheme to defraud, and 2) use of either the mails or wire service in furtherance of the scheme."[25] *Simon* thus requires only a specific intent to defraud, but not a specific intent to use the mails.

A panel of this court cannot overrule binding precedent issued by a prior panel. However, to the extent that *Bannister* and related cases hold that specific intent to use the mails is required in proof of a conspiracy to commit mail fraud, we find that they have been implicitly overruled by intervening Supreme Court decisions. *Pereira v. United States*[26] held that specific intent to use the mails is not necessary to prove a substantive charge of mail fraud: "Where one does an act with knowledge that the use of the mails will follow in the

---

**18.** *See* R2–37, 40–41 (cross-examination of co-conspirator Caylor); R2–55–56 (cross-examination of co-conspirator Peeler).

**19.** *See, e.g.,* R2–39 (co-conspirator Caylor testified that it was reasonable that "paperwork" will have to be sent to various State Farm offices); R2–59 (prosecutor questions co-conspirator Peeler; "Q. [A]lthough you may not have known that ... a copy of a check was going to be mailed to Jacksonville, did you believe something would be mailed somewhere? A. Yes, sir.").

**20.** *See generally United States v. Massey,* 827 F.2d 995, 1001 (5th Cir.1987) ("[R]eversal of appellants' convictions for committing the substantive crime of mail fraud does not require a reversal of their convictions for conspiring to commit mail fraud.").

**21.** R2–107.

**22.** 379 F.2d at 750.

**23.** *Id.* at 753 n. 4 (citations omitted); *see also United States v. Kent,* 608 F.2d 542, 547 (5th Cir.1979) ("The basis for the offense of conspiracy to commit mail fraud is 'an agreement to use the mails to defraud.'" (citations omitted)), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980); *Abbott v. United States,* 239

F.2d 310, 314 (5th Cir.1956) ("Did the specified act of mailing the letter and checks further the execution of that scheme? On this inquiry, it is, in this case, unlike a charge of conspiracy to use the mails to defraud which, being an *agreement,* calls for proof on an *intended* use of the mails." (citations omitted; emphasis in original)); *Guardalibini v. United States,* 128 F.2d 984, 985 (5th Cir.1942) (conspiracy to commit mail fraud requires proof of intent to use the mails).

**24.** 839 F.2d 1461 (11th Cir.), *cert. denied,* 488 U.S. 861, 109 S.Ct. 158, 102 L.Ed.2d 129 (1988).

**25.** *Id.* at 1469 (citations omitted); *see also United States v. Netterville,* 553 F.2d 903, 908–09 (5th Cir.1977) ("In order for us to sustain appellants' convictions for conspiracy, the proof must be sufficient to show that two or more persons conspired for an illegal purpose. The illegal purpose alleged by the government in this case is mail fraud; the elements of mail fraud are a scheme to defraud, and use of the mails in execution of the scheme. Altogether, the proof must show a conspiracy to defraud, in execution of which the mails are used."), *cert. denied,* 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978).

**26.** 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." [27]  And in *United States v. Feola*,[28] the Court held that a federal conspiracy conviction does not require a greater level of criminal intent than a conviction on a substantive count: "[W]e hold that where knowledge of the facts giving rise to federal jurisdiction is not necessary for conviction of a substantive offense embodying a mens rea requirement, such knowledge is equally irrelevant to questions of responsibility for conspiracy to commit that offense." [29]  The "fact[ ] giving rise to federal jurisdiction" here is the use of the mails. Putting *Pereira* and *Feola* together, it is clear that proof of a specific intent to use the mails is not required to show conspiracy to commit mail fraud. We therefore reject Smith's argument that the government had to prove that the conspirators agreed to use the mails to further their frauds.[30]

■ In this case, it was necessary for the success of the conspiracy that the medical forms be mailed.[31]  The government proved that mailings relating to LeBron Beene's medical care were made. And the government showed that the conspirators foresaw the use of the mails in processing the claims.[32]  We therefore find that Smith was properly convicted of conspiracy to commit mail fraud.

## IV.

■ Smith complains that the prosecutor stated during his closing argument to the jury that Smith "has not taken responsibility for his actions" [33] because he refused to plead guilty, whereas his co-defendants entered guilty pleas. Smith objected; the district court sustained the objection and gave a curative instruction. Smith now argues that this statement was so prejudicial as to deny him his sixth amendment right to trial by an impartial jury.[34]

The prosecutor's remarks were improper, but we also believe the error was harmless. The district court gave a clear and complete instruction to the jury immediately after the improper comment.[35]  And because there was ample evidence to convict Smith for conspiracy to commit mail fraud, we do not believe "there is a reasonable probability that the [error] might have contributed to the conviction." [36]

---

27. 347 U.S. at 8–9, 74 S.Ct. at 363 (citation omitted).

28. 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975).

29. 420 U.S. at 696, 95 S.Ct. at 1269.

30. *See United States v. Turley,* 891 F.2d 57, 60 (3d Cir.1989) ("Because use of the mails is merely the jurisdictional element by which a state fraud offense is turned into the federal crime of mail fraud, we hold that specific intent to use the mails need not exist as an essential element of the scheme...."); *United States v. Reed,* 721 F.2d 1059, 1060–61 (6th Cir.1983) (rejecting on the basis of *Pereira* and *Feola* prior sixth circuit precedent requiring a showing of specific intent to use the mails in mail fraud conspiracies); *see also United States v. Craig,* 573 F.2d 455, 486 (7th Cir.1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 82, 58 L.Ed.2d 110 (1978).

31. *See United States v. McNeill,* 728 F.2d 5, 14 (1st Cir.1984) (mailing of medical report brings crime within mail fraud statute).

32. *See supra* note 19 (testimony of co-conspirators).

33. R2–144.

34. *See, e.g., United States v. Fleetwood,* 528 F.2d 528, 532 (5th Cir.1976) ("We long ago determined that '[a] defendant is entitled to have the questions of his guilt determined upon the evidence against him, not on whether a Government witness or codefendant has pled guilty to the same charge.' This principle is so firmly established as to be almost a maxim." (citation and footnote omitted)).

35. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 644, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974) (following an improper prosecutorial comment, "the judge directed the jury's attention to the remark particularly challenged here, declared it to be unsupported, and admonished the jury to ignore it. Although some occurrences at trial may be too clearly prejudicial for such a curative instruction to mitigate their effect, the comment in this case is hardly of such character." (footnote omitted)).

36. *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963).

## V.

Smith's convictions on the substantive mail fraud counts (counts one, two, and three) are REVERSED. Smith's conviction on the conspiracy count (count four) is AFFIRMED. This case is REMANDED for resentencing.