STATE OF NORTH CAROLINA v. BILLY RAY BYRD

No. COA06-1368

(Filed 4 September 2007)

**1. Sentencing— enhancement—domestic violence—violation of valid protective order—motion to dismiss**

    The trial court did not err in a domestic violence case involving assault with a deadly weapon with intent to kill by denying defendant's motion to dismiss the enhancement of violation of a valid protective order under N.C.G.S. § 50B-4.1, because: (1) N.C.G.S. § 50B-2(a) allows a person to seek the same kind of relief provided by Chapter 50B by filing a civil action under Chapter 50 and a motion in the cause alleging acts of domestic violence; (2) the wife victim filed a civil action under Chapter 50 for divorce from bed and board, and she was thereafter permitted under N.C.G.S. § 50B-2 to file a motion in the cause in her Chapter 50 action alleging acts of domestic violence to avail herself of the protections found in Chapter 50B; (3) the temporary restraining order (TRO) granted in the Chapter 50 action was issued under Chapter 50B; and (4) the ex parte TRO was a protective order within the meaning of Chapter 50B since the hearing requirement found in N.C.G.S. § 50B-1(c) was satisfied when defendant received notice that a TRO had been entered against him.

**2. Domestic Violence— instructions—enhancement provisions in Chapter 50B—knowing violation—ignorance of law**

    The trial court did not err a domestic violence case involving assault with a deadly weapon with intent to kill by its instructions to the jury as they related to the enhancement provisions in Chapter 50B based on a violation of a valid domestic violence protective order, because: (1) defendant conceded that he was aware of the temporary restraining order (TRO), but that he made a mistake of law as to the legal impact of the TRO; and (2) it is well-settled that ignorance of the law or a mistake of law is no defense to criminal prosecution.

**3. Criminal Law— prosecutor's argument—defendant's failure to plead guilty—harmless error—overwhelming evidence of guilt**

    A prosecutor's improper comment referencing defendant's failure to plead guilty was harmless error in a domestic violence

case involving assault with a deadly weapon with intent to kill, and defendant was not entitled to a new trial, because: (1) this kind of error is deemed harmless if a curative instruction is given, or if the State can show that the evidence of defendant's guilt was overwhelming; and (2) the State has established that the evidence of defendant's guilt was overwhelming when defendant had ample time to stop shooting but instead pointed the gun at his wife for a second time and shot her in the head.

Judge WYNN dissenting.

Appeal by defendant from judgments entered 26 August 2005 by Judge James U. Downs in Buncombe County Superior Court. Heard in the Court of Appeals 22 May 2007.

*Attorney General Roy A. Cooper, III, by Assistant Attorney General Elizabeth F. Parsons, for the State.*

*Glover & Petersen, P.A., by James R. Glover and Ann B. Petersen, for defendant-appellant.*

HUNTER, Judge.

Billy Ray Byrd ("defendant") appeals his conviction and sentence for assault with a deadly weapon with intent to kill. After careful consideration, we find no prejudicial error.

Defendant's wife, Carrie Byrd ("C. Byrd"), filed a *pro se* complaint and motion for a domestic violence protective order against defendant on 11 March 2003. On 13 March 2003, the district court issued an *ex parte* order. Thereafter, the district court issued a protective order for one year. Defendant and C. Byrd, however, eventually reconciled, and the district court granted the victim's motion to set aside the protective order.

One year after filing the original order, C. Byrd, through counsel, commenced a civil action for divorce from bed and board. *Byrd v. Byrd,* No. 04-CVD-114 (Transylvania County District Court). The complaint stated that C. Byrd and defendant were married in 1998 and had two sons together. The complaint also alleged that defendant had "physically assaulted and battered [her] on numerous occasions" and, "in the past, during periods of his intoxication, the Defendant has assaulted and battered [her], resulting in humiliation and serious bodily injury to her." According to the complaint, C. Byrd was "in fear for her own physical and mental wellbeing [sic] and that of

her children." She requested that defendant "not to go about, assault, threaten, molest, harass, interfere with, or bother [C. Byrd] in any way whatsoever."

With the civil complaint, C. Byrd also filed a motion for a preliminary injunction pursuant to N.C.R. Civ. P. 65(a) and for a temporary restraining order ("TRO") pursuant to Rule 65(b). On 11 March 2004, the district court issued an *ex parte* order. The order granted C. Byrd's request for a TRO and set a hearing date of 15 March 2004. The TRO, with accompanying documents, was served on defendant on 12 March 2004. Defendant met with his attorney on 15 March 2004, and the attorney requested a continuance. The hearing and the TRO were both continued until 24 March 2004.

The State's evidence at trial tended to show that defendant entered the office building where his wife worked on 23 March 2004, armed with a .22 caliber, semi-automatic rifle. Gerald Cotton ("Cotton"), a witness and alleged victim of defendant's actions, testified that he heard defendant say, " 'This is what you want[?]' " twice, and C. Byrd responded " 'no' " two times. Cotton also said that defendant pointed the rifle at his chest and pulled the trigger, but the gun did not fire. Cotton ran toward the back door and heard two more shots while he was fleeing.

Beth Vockley ("Vockley"), the branch supervisor of C. Byrd's office, came out of her office when she saw Cotton run down the hall. Vockley saw defendant pointing the gun at C. Byrd. Vockley told him not to shoot C. Byrd. C. Byrd pushed the gun away and ran toward Vockley's office. Vockley heard two gun shots, and C. Byrd fell to the floor after the second. Defendant dropped the rifle on the floor and walked out.

C. Byrd was taken to Mission Memorial Hospital, where she underwent surgery for a bullet wound in the left frontal area of her head. She recovered after the surgery but continued to have difficulty forming words and multi-tasking.

Defendant was indicted for the following offenses: (1) attempted murder of C. Byrd and knowing violation of a valid domestic violence protective order (O4CRS054011); (2) assault with a deadly weapon with intent to kill inflicting serious injury on C. Byrd and knowing violation of a valid domestic violence protective order (04CRS053565); (3) knowingly violating a valid domestic violence protective order by going to C. Byrd's workplace (04CRS053567); (4)

attempted murder of Cotton (04CRS054012); and (5) assault with a deadly weapon with intent to kill Cotton (04CRS053571).

On 23 August 2005, the jurors having reached an impasse as to the charge of attempted murder of C. Byrd, the trial court declared a mistrial as to that charge. The jurors found defendant guilty of the Class C felony of assault with a deadly weapon with intent to kill inflicting serious injury on C. Byrd, the misdemeanor charge of knowingly violating a valid protective order, and misdemeanor assault with a deadly weapon of Cotton. Defendant was found not guilty of attempted murder of Cotton.

After additional deliberation on the charge of felonious assault on C. Byrd, the jurors found defendant knowingly violated a valid domestic violence protective order. The jurors also found an aggravating factor that defendant inflicted permanent and debilitating injury on C. Byrd.

At sentencing, the trial court found Prior Record Level I as to the Class C felonious assault on C. Byrd. Based on the jury finding of violation of a protective order, the offense was elevated to Class B2. The trial court found that mitigating factors were outweighed by the jury's finding of permanent and debilitating injury. The trial court imposed a sentence in the aggravated range of 196 to 245 months. Finding Prior Record Level II as to the misdemeanor assault of Cotton, the trial court imposed a consecutive sentence of seventy-five days. Defendant appeals his convictions.

Defendant presents the following issues for this Court's review: (1) whether the TRO issued in C. Byrd's action for divorce from bed and board is distinguishable from a protective order; (2) if the TRO was a valid protective order, whether defendant violated it knowingly; and (3) whether improper statements by the prosecutor at trial entitle defendant to a new trial.

I.

[1] Defendant's first argument is that the trial court erred in denying his motion to dismiss the enhancement of violation of a valid protective order. This is an issue of first impression and arises under superseded Chapter 50B statutes.[1] Under N.C. Gen. Stat. § 50B-4.1(a)

___

1. The provisions of Chapter 50B relating to actions for relief from domestic violence have been amended many times since the Chapter was first enacted in 1979. The relevant statutes in this case have been amended subsequent to the March 2004 application for and issuance of the TRO at issue in this case. Accordingly, we review the relevant provisions of Chapter 50B as they existed in March 2004.

(2003), a person will face criminal penalties when he "knowingly violates a valid protective order entered pursuant to . . . Chapter [50B]" of the General Statutes. *Id.* Normally, such a violation would result in a Class A1 misdemeanor. The jury returned a verdict of guilty on this charge; however, the misdemeanor judgment was arrested and is ·not on appeal before this Court.

When a person commits a felony in the course of knowingly violating a valid protective order, as defendant was alleged to have done in this case, N.C. Gen. Stat. §§ 50B-4.1(d) and (e) enhance the penalty one felony class higher. During the sentencing phase of this case, the jury returned a verdict that defendant knowingly violated a domestic violence protective order in the same course of conduct constituting the assault with a deadly weapon with intent to kill charge. Consequently, the maximum penalty in the aggravated range that could be imposed was increased from a Class C felony to that of a Class B2 felony. N.C. Gen. Stat. §§ 15A-1340.17(c) and (e). As a result, defendant faced a term of imprisonment for 245 months instead of a term of 120 months. *Id.*

At trial, defendant objected to the enhancement on the grounds that the TRO was not a valid protective order entered pursuant to Chapter 50B. Accordingly, we must determine whether the TRO granted between defendant and C. Byrd would permit enhancement under section 50B-4.1(d) upon its violation.

"Statutory interpretation properly begins with an examination of the plain words of the statute." *Correll v. Division of Social Services,* 332 N.C. 141, 144, 418 S.E.2d 232, 235 (1992). Additionally, "it is presumed the General Assembly intended the words it used to have the meaning they have in ordinary speech. When the plain meaning of a statute is unambiguous, a court should go no further in interpreting the statute." *Nelson v. Battle Forest Friends Meeting,* 335 N.C. 133, 136, 436 S.E.2d 122, 124 (1993) (citations omitted). Accordingly, the relevant portions of the statute are quoted below:

> (a) Except as otherwise provided by law, a person who knowingly violates a valid protective order entered pursuant to this Chapter or who knowingly violates a valid protective order entered by the courts of another state or the courts of an Indian tribe shall be guilty of a Class A1 misdemeanor.

> . . .

(d) Unless covered under some other provision of law providing greater punishment, a person who commits a felony at a time when the person knows the behavior is prohibited by a valid protective order as provided in subsection (a) of this section shall be guilty of a felony one class higher than the principal felony described in the charging document. This subsection shall not apply to a person who is charged with or convicted of a Class A or B1 felony or to a person charged under subsection (f) of this section.

N.C. Gen. Stat. § 50B-4.1(a), (d). Defendant argues that a sentence enhancement may occur only if the protective order is issued pursuant to the provisions of Chapter 50B. We disagree.

First, such an interpretation ignores language found within Chapter 50B:

Any person residing in this State may seek relief under this Chapter by filing a civil action *or by filing a motion in any existing action filed under Chapter 50 of the General Statutes alleging acts of domestic violence against himself or herself* or a minor child who resides with or is in the custody of such person.

N.C. Gen. Stat. § 50B-2(a) (2003) (emphasis added). In other words, this statute allows a person to seek the same kind of relief provided by Chapter 50B by filing a civil action under Chapter 50 and a motion in the cause alleging acts of domestic violence.

In the instant case, C. Byrd filed a civil action under Chapter 50 (divorce from bed and board). *See* N.C. Gen. Stat. § 50-7 (2003). Under N.C. Gen. Stat. § 50B-2 she was then permitted to file a motion in the cause in her Chapter 50 action alleging acts of domestic violence to avail herself of the protections found in Chapter 50B. Here, C. Byrd did in fact file a motion in the cause alleging acts of domestic violence against herself from a person that resides with her. These allegations were consistent with the definition of "domestic violence" found in N.C. Gen. Stat. § 50B-1(a). Specifically, C. Byrd alleged that defendant had attempted to cause bodily injury against her. Thus, we hold that the TRO granted in the Chapter 50 action was issued pursuant to Chapter 50B.

We next turn to the issue of whether the TRO was a "protective order" within the meaning of the statute. A " 'protective order' includes *any order* entered pursuant to this Chapter *upon hearing* by

the court or consent of the parties." N.C. Gen. Stat. § 50B-1(c) (2003) (emphasis added). At the outset, there is no dispute that the TRO was an order, and as we concluded above, it was entered pursuant to Chapter 50B. The TRO, however, was not entered with consent of the parties. Thus, the TRO, entered *ex parte*, will only be a protective order if it was entered pursuant to a hearing.

An *ex parte* proceeding is also known as an *ex parte* "hearing." Black's Law Dictionary 1241 (8th ed. 2004); *see also State v. May*, 354 N.C. 172, 183, 552 S.E.2d 151, 158 (2001) (characterizing an order entered *ex parte* as being issued pursuant to an "*ex parte* hearing"). Indeed, Section 50B itself uses the phrase "*ex parte* hearing" three times. *See* N.C. Gen. Stat. §§ 50B-2 (b), (c) (clerk of superior court required to schedule *ex parte* hearing), and (d) (when emergency relief is granted by a magistrate under subsection (d) an ex parte hearing must be scheduled the next day before a district court judge). Moreover, for there to be an *ex parte* order the trial judge must hold a hearing in which affidavits and supporting documents are reviewed, even though only one party is present, before issuing a protective order. Thus, we conclude that the legislature intended the hearing requirement found in N.C. Gen. Stat. § 50B-1(c) to be satisfied when an *ex parte* order is issued pursuant to Chapter 50B. To hold otherwise would allow one who had notice[2] that an *ex parte* Chapter 50B order had been entered against him a ten-day window[3] in which to continue acts of domestic violence against the party who sought the order, while avoiding the corresponding sentencing enhancement provided in Chapter 50B. We do not believe the legislature intended such a result.

"The best indicia of [legislative] intent are the language of the statute or ordinance, the spirit of the act and what the act seeks to accomplish." *Concrete Co. v. Bd. of Comm'rs of Town of Nags Head*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980). It is without question that the language of the statute, the spirit of Section 50B, and what the act seeks to accomplish is to protect individuals from domestic violence through, *inter alia*, the imposition of an enhanced sentencing to serve as a deterrent against those who perpetrate the violence. Our interpretation of the statute is inline with this intent.

2. The requirement of notice is discussed in section II of this opinion.

3. Under N.C. Gen. Stat. § 50B-2(c), a hearing on an *ex parte* order is required within ten days of the issuance of that order.

Thus, in the instant case, the "hearing" requirement found in N.C. Gen. Stat. § 50B-1(c) was satisfied when defendant received notice[4] that a TRO had been entered against him. We therefore hold that the TRO was a "protective" order within the meaning of Chapter 50B, and defendant's arguments to the contrary are rejected.

II.

**[2]** Defendant next argues that the trial court erred in its instructions to the jury as they related to the enhancement provisions in Chapter 50B. We disagree.

Under N.C. Gen. Stat. § 50B-4.1(d) "a person who commits a felony at a time when the person *knows* the behavior is prohibited by a valid protective order *as provided in subsection (a)* of this section shall be guilty of a felony one class higher than the principal felony described in the charging document." *Id.* (emphasis added). Subsection (a) requires that before a defendant's sentence may be enhanced the trier of fact must find that the defendant "knowingly violat[ed] a valid protective order entered pursuant to . . . Chapter [50B]." N.C. Gen. Stat. § 50B-4.1(a). Similarly, under N.C. Gen. Stat. § 50B-4.1(e), "a finding shall be made that [defendant] *knowingly violated the protective order* in the course of conduct constituting the underlying felony." *Id.* (emphasis added).

In this case, the jury found defendant "guilty of violating a valid domestic violence protective order[.]" On the issue of enhancement, the trial court instructed the jury that the State was required to prove: (1) that a valid domestic violence protective order existed; (2) that defendant violated the order; (3) that he did so knowingly; and (4) that he knowingly did so in the course of the conduct constituting the felony. Defendant argues that the omission of "Chapter 50B" language from the instruction means that the jury did not find that defendant knowingly violated a protective order entered pursuant to Chapter 50B. *See* N.C. Gen. Stat. § 50B-2.

In support of this position, defendant argues that his attorney explained to him that the TRO was not a valid protective order entered pursuant to Chapter 50B. This explanation, according to defendant, came before the alleged incidents that led to his arrest. In essence, defendant is conceding that he was aware of the TRO, which we have already concluded to be a valid protective order, but that he

_____

4. We conclude in Section II of this opinion that defendant had notice of the Chapter 50 order, entered pursuant to Chapter 50B, against him.

made a mistake of law as to the legal impact of the TRO. It is well settled "that ignorance of the law or a mistake of law is no defense to criminal prosecution[.]" *State v. Bryant*, 359 N.C. 554, 566, 614 S.E.2d 479, 486 (2005) (also noting an exception to this rule not relevant to the outcome of this case). Accordingly, we find no error in the trial court's instructions to the jury.

### III.

**[3]** Defendant next argues that an improper comment[5] by the prosecutor warrants a new trial because the trial court sustained the objection but failed to give the jury a corrective instruction sufficient to cure the error. The prosecutor's statement was made during the cross-examination of a defense witness, Dr. Pete Sansbury. The relevant portion of the exchange follows:

Q You maintained and stated that [defendant] has consistently taken responsibility for his action and actively worked to confront his alcohol and drug abuse, which has attributed [sic] to his aggressive action, isn't that right?

A Yes. In my interviews with him he was always totally focused on that he had done some terrible wrong here and blamed no one but himself.

Q *If the Defendant is taking responsibility for his actions, would he not come in and plead guilty?*

[Defense Counsel]: Well, Your Honor, objection to that.

THE COURT: Sustained.

[Defense Counsel]: Plead guilty to what?

A It's my understanding that he's been—

THE COURT: *Wait just a minute. There's no question for you to answer. The question was sustained. Don't consider the question, members of the jury.*

A Sorry. Sorry.

(Emphasis added.)

"[A] criminal defendant possesses an *absolute* constitutional right to plead not guilty and be tried before a jury, and 'should not and

---

5. The State makes no argument that the comment by the prosecutor was proper. Accordingly, we do not address that issue.

[can] not be punished for exercising that right.' " *State v. Thompson*, 118 N.C. App. 33, 41, 454 S.E.2d 271, 276, *disc. review denied*, 340 N.C. 262, 456 S.E.2d 837 (1995) (quoting *State v. Langford*, 319 N.C. 340, 345, 354 S.E.2d 523, 526 (1987)). "Reference by the State to a defendant's failure to plead guilty violates his constitutional right to a jury trial." *State v. Larry*, 345 N.C. 497, 524, 481 S.E.2d 907, 923 (1997) (citing *Thompson*, 118 N.C. App. at 41, 454 S.E.2d at 276. In the instant case, the State concedes that the statement by the prosecutor was improper. That, however, does not end our inquiry.

This kind of error is deemed harmless if a curative instruction is given. *United States v. Smith*, 934 F.2d 270, 275 (11th Cir. 1991) (footnote omitted) (the State's argument that the defendant had " 'not taken responsibility for his actions' because he refused to plead guilty" was "improper, but . . . the error was harmless" where a curative instruction was immediately given and "there was ample evidence to convict [the defendant]"). Alternatively, the State can show that the error was harmless beyond a reasonable doubt by showing that the evidence of defendant's guilt was overwhelming. *Thompson*, 118 N.C. App. at 42, 454 S.E.2d at 276. Because we hold that the State has established that the evidence of defendant's guilt was overwhelming, we need not address whether the trial court's curative statement was adequate.

Defendant concedes that the evidence against him for the charge of assaulting Cotton was overwhelming, but argues that the evidence of his specific intent to kill C. Byrd for the charge of assault with a deadly weapon with intent to kill was far short of overwhelming. We disagree.

First, the evidence tended to show that defendant purchased a rifle on the day of the shooting. He drove to C. Byrd's office, parked at the back, and slunk alongside the building towards the front. He opened the office door and said to C. Byrd, " '[t]his is what you want, this is what you want[.]' " He then fired two shots at C. Byrd before she was able to run away. After trying to fire at Cotton, defendant pointed the rifle back towards C. Byrd, who was attempting to flee, and said, " '[w]hat do you think you're doing, you crazy b——?' " Vockley asked defendant not to shoot C. Byrd, but defendant fired two more shots at C. Byrd from behind, striking her once in the head. In short, defendant had ample time to stop shooting, but instead he pointed the gun at C. Byrd for a second time and shot her in the head. This is overwhelming evidence that defendant had a specific intent to kill C. Byrd. Accordingly, we find harmless error as to this issue.

## IV.

In summary, we find no error in defendant's conviction of assault with a deadly weapon with intent to kill and the corresponding enhancement imposed by Chapter 50B. We similarly find harmless error in the comments made by the prosecutor during defendant's trial.

No prejudicial error.

Judge CALABRIA concurs.

Judge WYNN dissents in a separate opinion.

WYNN, Judge, dissenting.

I concur with that portion of the majority opinion that finds no prejudicial error in the allegedly improper statements made by the prosecutor at trial. However, because the plain meaning of Chapter 50B of the North Carolina General Statutes necessitates a finding that the temporary restraining order against Defendant does not allow his sentence to be enhanced, I respectfully dissent.

As noted by the majority, "[w]hen the plain meaning of a statute is unambiguous, a court should go no further in interpreting the statute." *Nelson v. Battle Forest Friends Meeting*, 335 N.C. 133, 136, 436 S.E.2d 122, 124 (1993). Thus, "[i]f the statute is clear and unambiguous, we will apply the plain meaning of the words, with no need to resort to judicial construction." *Wiggs v. Edgecombe County*, 361 N.C. 318, 322, 643 S.E.2d 904, 907 (2007) (citation omitted). Nevertheless, this Court will turn to determining the purpose of a statute and "the intent of the legislature in its enactment" when a statute is ambiguous in its language. *Diaz v. Div. of Soc. Servs.*, 360 N.C. 384, 387, 628 S.E.2d 1, 3 (2006) (citation and quotation omitted). Accordingly, if a statute is unambiguous, as in the instant case, we have no need to speculate as to the legislative intent, as the majority does here.

Chapter 50B of the North Carolina General Statutes explicitly states that, "[a]s used in this Chapter, the term 'protective order' includes any order entered pursuant to this Chapter *upon hearing by the court* or consent of the parties." N.C. Gen. Stat. § 50B-1(c) (2003) (emphasis added). Further, under Chapter 50B, a sentence enhancement may be imposed for "a person who commits a felony at a time

when the person knows the behavior is prohibited by a valid *protective order*," N.C. Gen. Stat. § 50B-4.1 (d) (2003) (emphasis added), after "a finding . . . that the person knowingly violated the *protective order* in the course of conduct constituting the underlying felony." *Id.* at § 50B-4.1(e) (emphasis added).

Even if, as reasoned by the majority, the temporary restraining order (TRO) at issue in this case was entered pursuant to Chapter 50B, thereby satisfying the first part of Chapter 50B-1(c), no hearing was held in the instant case, such that the second part of the definition of "protective order" was not met. The record before us shows that the trial court issued the TRO against Defendant in an 11 March 2004 *ex parte* order, specifically finding that the TRO was "granted without notice to the Defendant for that insufficient time exists during which to provide Defendant notice as otherwise by law provided . . ." Moreover, the trial court set a hearing date of 15 March 2004 for Ms. Byrd's motion for a preliminary injunction and stated that the TRO "shall terminate at 9:00 o'clock A.M. on the tenth (10th) day next following the date hereof, unless extended as by law provided." On 15 March 2004, when Defendant's attorney moved for a continuance of the hearing on Ms. Byrd's motion for a preliminary injunction, the trial court continued the TRO "pending further order modifying the same."

None of these actions by the trial court constituted a "hearing." Although, as stated by the majority, an *ex parte* proceeding may also be called an *ex parte* hearing, it remains "[a] proceeding in which not all parties are present or given the opportunity to be heard," regardless of the moniker used. Black's Law Dictionary 1241 (8th ed. 2004). Indeed, *ex parte* proceedings are specifically defined as those "[d]one or made at the instance and for the benefit of one party only, and without notice to, or argument by, any person adversely interested; of or relating to court action taken by one party without notice to the other, usu[ally] for *temporary or emergency relief*." *Id.* at 616 (emphasis added).

Moreover, an *ex parte* temporary restraining order generally serves the sole purpose of maintaining the status quo until a hearing can be held. *Huff v. Huff*, 69 N.C. App. 447, 450, 317 S.E.2d 65, 67 (1984). As we have previously noted, procedural safeguards such as the definite duration of a temporary restraining order ensure that the "drastic" procedure passes constitutional muster, allowing it to "operate[] within an emergency context which recognizes the need for

swift action" but still "immediately affords defendants notice and an opportunity to be heard" at a later, scheduled hearing. *State ex rel. Gilchrist v. Hurley*, 48 N.C. App. 433, 448, 269 S.E.2d 646, 655 (1980), *disc. review denied*, 301 N.C. 720, 274 S.E.2d 233 (1981). Thus, a TRO is designed to provide immediate relief but serve only as a "stopgap" measure until a court may schedule a hearing to consider *both* sides and the full merits of a dispute.

The showing required for a TRO reflects the emergency nature of the order. To secure a TRO, a plaintiff need only argue that "immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition[.]" N.C. Gen. Stat. § 1A-1, Rule 65(b); *see also Taylor v. Centura Bank*, 124 N.C. App. 661, 663, 478 S.E.2d 226, 227 (1996) ("All TROs must be obtained pursuant to N.C. R. Civ. P. 65."). A TRO may then be granted and remain in place for ten days, until the trial court can convene a hearing to consider the full merits and whether the TRO should be transformed into a more permanent preliminary injunction, if the plaintiff can show both a likelihood of irreparable injury and of success on the merits of her claim at trial. *Iredell Digestive Disease Clinic v. Petrozza*, 92 N.C. App. 21, 24-25, 373 S.E.2d 449, 451 (1988), *aff'd per curiam*, 324 N.C. 327, 377 S.E.2d 750 (1989).

Chapter 50B itself allows for such *ex parte* TROs:

> *Prior to the hearing*, if it clearly appears to the court from specific facts shown, that there is a danger of acts of domestic violence against the aggrieved party or a minor child, the court may enter such orders as it deems necessary to protect the aggrieved party or minor children from such acts[.]

N.C. Gen. Stat. § 50B-2(c) (2003) (emphasis added). The statute further provides that "[u]pon the issuance of an *ex parte* order under this subsection, a hearing shall be held within 10 days from the date of issuance of the order or within seven days from the date of service of process on the other party, whichever occurs later." *Id.* From its express terms, then, Chapter 50B recognizes that *ex parte* orders such as the one at issue in this case are remedies available to an aggrieved party "prior to [a] hearing." As such, the plain meaning of the language used to describe "*ex parte* orders" in Chapter 50B precludes their inclusion as "protective orders" "entered pursuant to this Chapter *upon hearing by the court* or consent of the parties." N.C. Gen. Stat. § 50B-1(c).

This distinction is particularly significant in the context of the instant case. Here, the *ex parte* TRO entered against Defendant was used to enhance his sentence for his felony convictions—in other words, the TRO was employed to deprive Defendant of a liberty interest. Perhaps such an outcome would be warranted against Defendant, who was shown at trial to have stalked and severely injured Ms. Byrd and her coworker. Nevertheless, our Constitution requires us to safeguard the liberty of even the most unsavory of defendants, depriving them of such only after due process of law. U.S. Const. amend. XIV, § 1. To increase Defendant's prison term on the basis of a TRO, without affording him the opportunity to be heard as to the allegations of domestic violence against him, would violate his right to due process. I would therefore remand this case for resentencing.