STATE OF NORTH CAROLINA v. BILLY RAY BYRD

No. 499A07

(Filed 5 May 2009)

## 1. Domestic Violence— protective order—ex parte temporary restraining order entered under Rule 65(b) not valid protective order under Chapter 50(b)

The trial court erred in an assault with a deadly weapon with intent to kill inflicting serious injury case by enhancing defendant's sentence under N.C.G.S. § 50B-4.1(d) based on his alleged knowing violation of a valid domestic violence protective order because: (1) the trial court's 11 March 2004 order stated that it was entered under N.C.G.S. § 1A-1, Rule 65(b), and thus, it was an *ex parte* temporary restraining order (TRO) entered under Rule 65(b) instead of a valid domestic violence protective order entered under Chapter 50B; (2) the fact  that the motion was made in the victim's existing action for divorce from bed and board under Chapter 50 and that the TRO contains language similar to that in N.C.G.S. § 50B-3(a) does not bring the TRO within the definition of a valid protective order as defined in N.C.G.S. § 50B-1; (3) although the intended purpose of the TRO was to accomplish the same objective as a valid protective order under N.C.G.S. § 50B-3(a), the Legislature did not provide in N.C.G.S. § 50B-4.1(a) that knowing violation of a TRO or preliminary injunction entered under Rule 65 would constitute a Class A1 misdemeanor, nor did the Legislature provide that such a violation would raise the felony one class higher than the principal felony charged; (4) even if the TRO had been entered under Chapter 50B, it failed to meet the second prong of the definition of a valid domestic violence protective order since it was not entered upon a hearing by the court or consent of the parties, and merely putting defendant on notice that a TRO had been entered against him does not satisfy the hearing requirement necessary to permit a sentence enhancement under N.C.G.S. § 50B-4.1(d); and (5) by limiting applicability of the enhancement provision to violation of protective orders issued after a hearing, our General Assembly recognized and gave deference to protection of a defendant's liberty interest through due process of law.

STATE v. BYRD

[363 N.C. 214 (2009)]

### 2. Appeal and Error— appealability—discretionary review improvidently allowed

Discretionary review of the instructional issue regarding sentencing enhancement in an assault with a deadly weapon with intent to kill inflicting serious injury case based on the alleged knowing violation of a valid domestic violence protective order was improvidently allowed.

Justice NEWBY dissenting.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 185 N.C. App. 597, 649 S.E.2d 444 (2007), finding no prejudicial error in a trial resulting in judgments entered 26 August 2005 by Judge James U. Downs in Superior Court, Buncombe County. On 8 November 2007, the Supreme Court allowed defendant's petition for discretionary review of additional issues. Heard in the Supreme Court 17 March 2008.

*Roy Cooper, Attorney General, by Elizabeth F. Parsons, Assistant Attorney General, for the State.*

*Glover & Petersen, P.A., by James R. Glover and Ann B. Petersen, for defendant-appellant.*

PARKER, Chief Justice.

Billy Ray Byrd ("defendant") appeals the enhanced sentence imposed upon his conviction for assault with a deadly weapon with intent to kill inflicting serious injury based on his knowing violation of a valid domestic violence protective order. For the reasons stated herein, we hold that the temporary restraining order ("TRO") entered in this case pursuant to Rule 65(b) of the North Carolina Rules of Civil Procedure was not a valid domestic violence protective order as defined by Chapter 50B of the General Statutes. The trial court, therefore, erred in enhancing defendant's sentence under N.C.G.S. § 50B-4.1(d).

Defendant's wife Carrie Byrd ("Carrie") filed a *pro se* complaint and motion for a domestic violence protective order on 13 March 2003 in District Court, Transylvania County. The district court entered an *ex parte* domestic violence order on 13 March 2003 and, following a hearing, issued a domestic violence protective order on 20 March 2003 valid for a term of one year. The couple reconciled within the order's one-year term, and Carrie's motion to set aside the protective order was allowed on 10 July 2003.

Approximately one year later on 11 March 2004, Carrie filed a complaint through counsel seeking, *inter alia,* divorce from bed and board. With the complaint, Carrie filed a motion for a preliminary injunction pursuant to North Carolina Rule of Civil Procedure 65(a) and also sought a TRO pursuant to Rule 65(b). Carrie's complaint and affidavit generally alleged that defendant had assaulted and battered her on numerous occasions up to and including the date of the complaint but did not allege specific acts of domestic violence except for an incident that occurred on 11 March 2003.

The district court issued an *ex parte* order granting Carrie's request for a TRO on 11 March 2004 and set a hearing date of 15 March 2004. The TRO was properly served on defendant on 12 March 2004. Defendant's counsel moved for a continuance on 15 March 2004, and the hearing and TRO were both continued until 24 March 2004. In entering the TRO, the trial court found, *inter alia:*

3. That the said verified Complaint, verified Motion, and Affidavit filed herein by applicant adequately avers grounds for the issuance of a temporary restraining order and that immediate and irreparable injury, loss, or damage will result to the applicant before notice can be served and a hearing had thereon.

4. The injury, loss or damage otherwise occurring to applicant is that Defendant may assault and batter Plaintiff as he has done in the recent past . . . .

The trial court concluded:

7. That the applicant's request for a temporary restraining order without notice to the Defendant should be allowed.

The trial court then ordered:

3. That pending the hearing provided for above, the Court orders and directs as follows:

. . . .

(b) That the Defendant is ordered and directed not to go about, assault, threaten, molest, harass, interfere with, or bother the Plaintiff and the minor children in any way whatsoever.

At trial on the charges in this criminal case, the State presented evidence tending to show that on 23 March 2004, defendant went to

Carrie's office with a .22-caliber semiautomatic rifle. Gerald Cotton ("Cotton"), a witness and alleged victim of defendant's actions, testified that defendant pointed the rifle at Cotton's chest and pulled the trigger, but the gun did not fire. Cotton ran toward the back door and heard two more shots as he was fleeing.

Beth Vockley ("Vockley"), the branch supervisor at Carrie's workplace, came out of her office when she saw Cotton running down the hall. Vockley saw defendant pointing the gun at Carrie and told him not to shoot her. Carrie pushed the gun away and ran toward Vockley's office. Vockley heard two gunshots. Carrie fell to the floor after the second. Defendant dropped the rifle on the floor and walked out of the office.

Carrie was taken to Mission Memorial Hospital, where she underwent surgery for a bullet wound in the left frontal area of her head. She recovered after the surgery but continues to have difficulty forming words and multitasking.

Defendant was indicted for the following offenses: (i) attempted murder of Carrie Byrd and knowing violation of a valid protective order under N.C.G.S. § 50B-4.1(a) (04CRS54011); (ii) assault with a deadly weapon with intent to kill inflicting serious injury on Carrie Byrd and knowing violation of a valid protective order under N.C.G.S. § 50B-4.1(a) (04CRS53565); (iii) knowingly violating a valid domestic violence protective order by going to Carrie's workplace (04CRS53567); (iv) attempted murder of Gerald Cotton and knowing violation of a valid protective order under N.C.G.S. § 50B-4.1(a) (04CRS54012); and (v) assault with a deadly weapon with intent to kill Gerald Cotton and knowing violation of a valid protective order under N.C.G.S. § 50B-4.1(a) (04CRS53571).

On 25 August 2005 the trial court declared a mistrial as to the attempted murder of Carrie, the jurors having reached an impasse on that charge. The jury found defendant guilty of the Class C felony of assault with a deadly weapon with intent to kill inflicting serious injury on Carrie, the misdemeanor charge of knowingly violating a valid domestic violence protective order, and misdemeanor assault with a deadly weapon on Cotton. Defendant was found not guilty of attempted murder of Cotton.

During the sentencing phase, the jury returned a verdict that defendant knowingly violated a domestic violence protective order in the same course of conduct which constituted the assault with a

deadly weapon with intent to kill inflicting serious injury on Carrie. The jury also found as an aggravating factor that defendant inflicted permanent and debilitating injury on Carrie Byrd.

The trial court found Prior Record Level I as to the Class C felonious assault on Carrie. Based on the jury's finding of a violation of a valid domestic violence protective order, the offense was elevated to Class B2 pursuant to N.C.G.S. § 50B-4.1(d). The trial court found that mitigating factors were outweighed by the jury's finding of permanent and debilitating injury. The trial court imposed a sentence in the aggravated range of 196 to 245 months imprisonment. Finding Prior Record Level II as to the misdemeanor assault on Cotton, the trial court imposed a consecutive sentence of seventy-five days imprisonment. The trial court arrested judgment on defendant's conviction for violation of a valid domestic violence protective order.

A divided panel of the Court of Appeals upheld defendant's conviction and enhanced sentence imposed under N.C.G.S. § 50B-4.1(d) for his knowing violation of a valid protective order. The dissenting judge disagreed with the majority's determination that defendant's sentence was properly enhanced for violation of a valid protective order.

On 9 October 2007 defendant gave notice of appeal to this Court based on the dissent in the Court of Appeals. On 8 November 2007, this Court allowed defendant's petition for discretionary review as to whether the trial court erred in its instructions to the jury on the enhancement provisions of N.C.G.S. § 50B-4.1.

[1] Defendant first contends that the trial court erred in denying, and the Court of Appeals erred in affirming the denial of, his motion to dismiss the enhancement of the penalty for his felonious assault conviction on account of his knowing violation of a valid domestic violence protective order. When a person commits a felony while knowingly violating a domestic violence protective order, N.C.G.S. § 50B-4.1(d) enhances the penalty one class higher. The maximum penalty in the aggravated range that could, therefore, be imposed was increased from a Class C felony to that of a Class B2 felony. N.C.G.S. § 15A-1340.17(c), (e) (2003). As a result, defendant's maximum term of imprisonment was set at 245 months instead of 120 months. *Id.*

In deciding whether defendant's contention has merit, we must first determine whether the TRO entered pursuant to Rule 65 of the Rules of Civil Procedure was, as a matter of law, a valid domestic vio-

lence protective order under Chapter 50B. To make this determination, we look to the language of the statutes. "Statutory interpretation properly begins with an examination of the plain words of the statute." *Correll v. Div. of Soc. Servs.*, 332 N.C. 141, 144, 418 S.E.2d 232, 235 (1992) (citing *Elec. Supply Co. of Durham v. Swain Elec. Co.*, 328 N.C. 651, 656, 403 S.E.2d 291, 294 (1991)). When a statute is clear and unambiguous, the Court will give effect to the plain meaning of the words without resorting to judicial construction. *Diaz v. Div. of Soc. Servs.*, 360 N.C. 384, 387, 628 S.E.2d 1, 3 (2006) (citing *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209, 388 S.E.2d 134, 136 (1990)). "However, when the language of a statute is ambiguous, this Court will determine the purpose of the statute and the intent of the legislature in its enactment." *Id.* (citing *Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980)).

Section 50B-4.1 provides in pertinent part:

(a) Except as otherwise provided by law, a person who knowingly violates a valid protective order entered pursuant to this Chapter or who knowingly violates a valid protective order entered by the courts of another state or the courts of an Indian tribe shall be guilty of a Class A1 misdemeanor.

. . . .

(d) Unless covered under some other provision of law providing greater punishment, a person who commits a felony at a time when the person knows the behavior is prohibited by a valid protective order as provided in subsection (a) of this section shall be guilty of a felony one class higher than the principal felony described in the charging document. This subsection shall not apply to a person who is charged with or convicted of a Class A or B1 felony or to a person charged under subsection (f) of this section.

N.C.G.S. § 50B-4.1 (2003).[1] For the penalty to be enhanced, the jury must make "a finding . . . that the person knowingly violated the protective order in the course of conduct constituting the underlying felony," N.C.G.S. § 50B-4.1(e), as was found by the jury in this case.

---

1. The relevant portions of Chapter 50B have been amended since March 2004, the date the TRO was issued. Accordingly, for purposes of this appeal the provisions of Chapter 50B in effect in March 2004 are applicable.

Section 50B-1 defines the term "protective order" as "includ[ing] any order entered pursuant to this Chapter upon hearing by the court or consent of the parties." N.C.G.S. § 50B-1(c) (2003). The TRO entered pursuant to Rule 65 in this case fails to meet either element of this definition as it was not entered pursuant to Chapter 50B and was not entered after a hearing by the court or with consent of the parties.

The order entered by the trial court on 11 March 2004 states that it was entered under Rule 65(b) of the North Carolina Rules of Civil Procedure. The trial court made a conclusion of law stating that "the applicant's request for a temporary restraining order without notice to the Defendant should be allowed." The order entered by the trial court was, therefore, an *ex parte* TRO entered under Rule 65(b), not a valid domestic violence protective order, entered pursuant to Chapter 50B.

The State, relying on N.C.G.S. § 50B-2, argues that the TRO entered in this case is the "functional legal equivalent" of a valid domestic violence protective order. Section 50B-2(a) provides that "[a]ny person residing in this State may seek relief under this Chapter . . . by filing a motion in any existing action filed under Chapter 50 of the General Statutes alleging acts of domestic violence against himself or herself." N.C.G.S. § 50B-2(a) (2003). The State contends that the TRO was entered pursuant to Chapter 50B in that it was obtained by Carrie's filing a motion, alleging acts of domestic violence, in her action for divorce from bed and board, filed under Chapter 50 of the General Statutes. We disagree.

For whatever reason, Carrie did not seek relief under Chapter 50B. Rather she sought relief under Rule 65(a) and (b) of the Rules of Civil Procedure. While Carrie might well have filed a Chapter 50B motion in her existing action for divorce from bed and board, she did not file such a motion. The fact that the motion was made in the victim's existing action for divorce from bed and board under Chapter 50 and that the TRO contains language similar to that in N.C.G.S. § 50B-3(a) does not bring the TRO within the definition of a valid protective order as defined in N.C.G.S. § 50B-1. At the time the TRO was entered, N.C.G.S. § 50B-3(a) permitted the court to grant "any protective order to bring about a cessation of acts of domestic violence." Carrie's complaint did not allege any recent specific acts of domestic violence, asserting only that defendant had "physically assaulted and battered the plaintiff on numerous occasions." The

TRO entered pursuant to Rule 65(b) did not make a finding that the order was necessary to bring about the cessation of acts of domestic violence. Unquestionably, the intended purpose of the TRO was to accomplish the same objective as a valid protective order under N.C.G.S. § 50B-3(a). Nevertheless, the Legislature did not provide in N.C.G.S. § 50B-4.1(a) that knowing violation of a TRO or preliminary injunction entered under Rule 65 of the Rules of Civil Procedure would constitute a Class A1 misdemeanor. Nor did the Legislature provide that such a violation would raise the felony one class higher than the principal felony charged in the charging document. N.C.G.S. § 50B-4.1(d) (2003).

Defendant also asserts that Carrie could not have met the requirements of a Chapter 50B protective order and urges this argument in support of his position that the TRO was not a valid protective order for purposes of N.C.G.S. § 50B-4.1(d). However, this issue is not properly before this Court, and we will not engage in speculation and conjecture as to how the trial court might have ruled had Carrie's motion been made pursuant to Chapter 50B rather than Rule 65 of the Rules of Civil Procedure.

Moreover, even if the TRO had been entered under Chapter 50B, which we have held it was not, it fails to meet the second prong of the definition of a valid domestic violence protective order in that it was not entered "upon hearing by the court or consent of the parties." N.C.G.S. § 50B-1(c). The State contends, and the Court of Appeals' majority agreed, that because an *ex parte* proceeding was held before the TRO was issued, the hearing requirement under N.C.G.S. § 50B-1(c) was satisfied. Again we disagree.

The provisions of Chapter 50B demonstrate that in the domestic violence context, the Legislature contemplated two separate proceedings whereby two types of orders could be entered, a valid protective order and an *ex parte* order. N.C.G.S. §§ 50B-1(c), -2(c), -3(b) (2003). If exigent circumstances require immediate issuance, without notice to the other party, of an order to protect a party, the General Assembly has provided for an *ex parte* order. Under Chapter 50B when "[p]rior to the hearing, if it clearly appears to the court from specific facts shown, that there is a danger of acts of domestic violence against the aggrieved party . . . the court may enter such orders as it deems necessary to protect the aggrieved party . . . from such acts." N.C.G.S. § 50B-2(c). A trial court entering an *ex parte* order under this subsection is also required to hold a "hearing . . . within 10

days from the date of issuance of the order or within seven days from the date of service of process on the other party, whichever occurs later." *Id.* By definition a valid protective order must be upon hearing or by consent of the parties. N.C.G.S. § 50B-1(c). That the definition of a "protective order" permits entry of the order by consent also suggests that the enjoined party must have had notice with the opportunity to be heard. The record before this Court reveals that no such hearing was held by the trial court before it entered the TRO on 11 March 2004. A hearing was scheduled for 15 March 2004, but was continued, along with the TRO, until 24 March 2004. The order granting the TRO states that the "applicant's request for temporary restraining order comes on without notice to the Defendant." The circumstances surrounding its entry, as well as the language of the order itself, make clear that no hearing of the type contemplated by N.C.G.S. § 50B-1(c) was held in this case. Only a valid protective order entered under Chapter 50B can be used to enhance a defendant's sentence under N.C.G.S. § 50B-4.1(d).

The majority in the Court of Appeals concluded that the *ex parte* hearing before entry of the TRO satisfied the hearing required for a valid protective order. In discussing this issue the Court of Appeals' majority opined that "what the act seeks to accomplish is to protect individuals from domestic violence through, *inter alia,* the imposition of an enhanced sentencing to serve as a deterrent against those who perpetrate the violence." *State v. Byrd,* 185 N.C. App. 597, 603, 649 S.E.2d 444, 449 (2007). The majority then concluded that "the 'hearing' requirement found in N.C. Gen. Stat. § 50B-1(c) was satisfied when defendant received notice that a TRO had been entered against him." *Id.* at 604, 649 S.E.2d at 449 (footnote omitted). We acknowledge that the term "hearing" is often used generically to refer to any proceeding before a court. *See Black's Law Dictionary* 737 (8th ed. 2004) (defining a hearing as "[a] judicial session . . . held for the purpose of deciding issues of fact or of law, sometimes with witnesses testifying"). We cannot, however, agree that this generic definition comports with the statutory scheme in Chapter 50B, which, in our view, requires that a defendant be given notice and the opportunity to be heard before entry of a protective order.

The dissenting opinion in the Court of Appeals, after discussing the hearing requirement under Chapter 50B and the distinction between an *ex parte* proceeding and the hearing required for a valid protective order, notes that the TRO was employed to deprive defendant of a liberty interest by enhancing his sentence for this felony con-

**STATE v. BYRD**

[363 N.C. 214 (2009)]

viction. The dissenting opinion then concludes, "To increase Defendant's prison term on the basis of a TRO, without affording him the opportunity to be heard as to the allegations of domestic violence against him, would violate his right to due process." *Byrd,* 185 N.C. App. at 610, 649 S.E.2d at 452 (Wynn, J., dissenting). We agree with the dissenting opinion that merely putting defendant on notice that a TRO had been entered against him does not satisfy the hearing requirement necessary to permit a sentence enhancement under N.C.G.S. § 50B-4.1(d).

The State contends that no constitutional argument was made before the trial court or the Court of Appeals and that the dissenting judge raised an issue not properly before that court. Defense counsel's argument before the trial court of defendant's motion to dismiss was not recorded; hence, no transcript is available from which this Court can ascertain what defendant argued to the trial court. In his brief to this Court, defendant makes in essence the same argument asserted in his brief to the Court of Appeals. In his brief to the Court of Appeals, defendant first noted that all orders issued under Chapter 50B may be enforceable by contempt proceedings under N.C.G.S. § 50B-4(a). Then, although not using the words, "due process of law," defendant stated that:

> Ex parte orders are granted on one sided affidavits filed by one party. Such orders may be sufficiently reliable to be enforceable by contempt proceedings. Only an order issued after the opposing party has an opportunity to be heard on the merits of a claim is sufficiently reliable to justify enforcement by criminal penalties.

We agree. Indeed, the opportunity to be heard and to challenge the truth of the adversary's assertions is part and parcel of due process. *Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 314, 94 L. Ed. 865, 873 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (citations omitted)). By limiting applicability of the enhancement provision to violation of protective orders issued after a hearing, our General Assembly recognized and gave deference to protection of a defendant's liberty interest through due process of law. We hold, therefore, that a TRO entered under Rule 65(b) of the Rules of Civil Procedure is not the "functional legal

equivalent" of a "protective order" entered pursuant to the procedure set forth in Chapter 50B.

[2] Having determined that the TRO was not a valid protective order under Chapter 50B, we conclude that the trial court erred in submitting the sentencing enhancement issue to the jury. We, therefore, do not address whether the instruction was proper.

For the foregoing reasons the decision of the Court of Appeals is reversed as to whether the TRO entered under Rule 65(b) satisfied the valid protective order requirement of N.C.G.S. § 50B-4.1(d). As to the instructional issue, discretionary review was improvidently allowed.

REVERSED; DISCRETIONARY REVIEW IMPROVIDENTLY ALLOWED.

Justice NEWBY dissenting.

Defendant shot his wife in knowing violation of a court order directing him not to commit acts of violence against her. Chapter 50B of the General Statutes evinces a clear legislative intent to punish recurrent domestic violence by imposing enhanced sentences on criminals such as defendant who violate protective orders. Yet today, our Court subverts the General Assembly's intent and raises formalistic concerns, thereby removing from the trial court the authority under N.C.G.S. § 50B-4.1 to punish defendant's wanton disregard of a strict court order. Because I would read the General Statutes liberally in the interest of deterring domestic violence through enhanced sentences, I respectfully dissent.

The majority's holding that enhanced sentencing under section 50B-4.1 is not available in this case is based initially on the fact that the temporary restraining order ("TRO") aimed at preventing acts of violence by defendant against his wife and children was technically entered pursuant to Rule of Civil Procedure 65(b) and was not specifically designated as a Chapter 50B domestic violence protective order. I cannot agree with the majority that the intent underlying section 50B-4.1 would preclude enhanced sentencing based merely on the statutory section number with which the violated order was labeled.

I believe the *ex parte* TRO granted to the victim Carrie Byrd ("Carrie") on 11 March 2004 was a protective order entered pursuant to Chapter 50B. Section 50B-2(a) provides in pertinent part: "Any person residing in this State may seek *relief under this Chapter* . . . by filing *a motion* in any existing action filed under Chapter 50 of the General Statutes alleging *acts of domestic violence against* [the movant] . . . ." N.C.G.S. § 50B-2(a) (2003)[2] (emphasis added). Therefore, one may obtain relief under Chapter 50B by making a motion to that end in a pending Chapter 50 action. Further, section 50B-2(a) imposes no limitation as to the statutory section under which such a motion must be filed. Carrie filed her Rule 65(b) motion in conjunction with a complaint under Chapter 50 of the General Statutes. Her Chapter 50 complaint alleged defendant had committed acts of violence against Carrie, stating defendant "physically assaulted and battered the Plaintiff on numerous occasions," causing her "humiliation and serious bodily injury" and leaving her "in fear for her own physical and mental wellbeing [sic] and that of her children." Carrie's affidavit in support of her motion for the TRO likewise asserted that defendant "repeatedly assaulted and battered the Plaintiff on many occasions" and referred specifically to defendant's assault and battery of Carrie on 11 March 2003, which in fact had previously been the basis of a Chapter 50B protective order. Carrie's Rule 65(b) motion thus satisfied the requirements of section 50B-2(a) for seeking relief pursuant to Chapter 50B.

Not all orders under Rule 65(b) are Chapter 50B protective orders. For example, a TRO sought and granted for the purpose of protecting personal property is appreciably different from a Chapter 50B protective order, which is designed "to bring about a cessation of acts of domestic violence" against spouses and children. *Id.* § 50B-3(a) (2003). When an applicant seeks protection from domestic violence as Carrie did, however, our courts should not afford less protection than the laws envision simply because the application explicitly invokes Rule 65(b) rather than Chapter 50B.

In addition to being entered upon a motion that satisfied section 50B-2(a), the TRO at issue here contains findings and directives that squarely implicate the purposes of a Chapter 50B protective order. In the 11 March 2004 TRO, the trial court found that "[t]he injury, loss or damage otherwise occurring to applicant is that Defendant may

---

2. Like the majority, I base my analysis of this appeal on the provisions of Chapter 50B that were in effect in March 2004. I note, however, that this analysis would apply equally to Chapter 50B as currently amended.

assault and batter Plaintiff as he has done in the recent past." The court went on to order defendant "not to go about, assault, threaten, molest, harass, interfere with, or bother the Plaintiff and the minor children in any way whatsoever." The TRO was entered upon a motion in a Chapter 50 action and was plainly intended "to bring about a cessation of acts of domestic violence." *Id.* It therefore qualifies as a Chapter 50B protective order.

It also bears noting that, because Carrie sought a TRO aimed at preventing defendant's acts of violence against her, the showings she had to make to obtain the Rule 65(b) TRO were indistinguishable from the showings required to obtain an *ex parte* protective order under section 50B-2(c). Rule 65(b) authorizes a TRO only if "it clearly appears from specific facts shown by affidavit or by verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition." N.C.G.S. § 1A-1, Rule 65(b) (2007). Indeed, in granting the TRO, the trial court specifically found that Carrie's complaint, motion, and affidavit "adequately aver[red] grounds for the issuance of a temporary restraining order and that immediate and irreparable injury, loss, or damage will result to the applicant before notice can be served and a hearing had thereon." In terms almost identical to those of Rule 65(b), section 50B-2(c) authorizes the court to "enter such [*ex parte*] orders as it deems necessary to protect the aggrieved party or minor children" from domestic violence "if it clearly appears to the court from specific facts shown[] that there is a danger of acts of domestic violence against the aggrieved party or a minor child." *Id.* § 50B-2(c) (2003). Because the "immediate and irreparable injury, loss, or damage" from which Carrie sought protection under Rule 65(b) was the same domestic violence with which Chapter 50B is concerned, Carrie could have obtained an *ex parte* protective order under section 50B-2(c) based on the very same affidavit that resulted in the TRO.[3] At any rate, the TRO Carrie obtained was a domestic violence protective order entered upon a motion filed in accordance with section 50B-2(a), and

_____

3. A section 50B-2(c) *ex parte* protective order is simply a specialized form of TRO. This is further demonstrated by the fact that the effective duration of a TRO is roughly the same as that of an *ex parte* order under section 50B-2(c). A TRO "shall expire by its terms within such time after entry, not to exceed 10 days, as the judge fixes." N.C.G.S. § 1A-1, Rule 65(b). Similarly, "[u]pon the issuance of an ex parte order under [section 50B-2(c)], a hearing shall be held within 10 days from the date of issuance of the order or within seven days from the date of service of process on the other party, whichever occurs later." *Id.* § 50B-2(c).

it thus qualifies as a protective order entered pursuant to Chapter 50B. I believe this treatment of the TRO does more to vindicate the legislative intent of deterring domestic violence than does a rigid reading of Chapter 50B that focuses on the minutiae of the TRO's form rather than its function.

Because the TRO was a protective order entered pursuant to Chapter 50B, defendant's knowing and felonious violation of the TRO should result in an enhanced sentence under section 50B-4.1, which provides in pertinent part:

(a) Except as otherwise provided by law, a person who knowingly violates a valid protective order entered pursuant to this Chapter . . . shall be guilty of a Class A1 misdemeanor.

. . . .

(d) Unless covered under some other provision of law providing greater punishment, a person who commits a felony at a time when the person knows the behavior is prohibited by a valid protective order as provided in subsection (a) of this section shall be guilty of a felony one class higher than the principal felony described in the charging document.

*Id.* § 50B-4.1 (2003).[4]

Besides unduly focusing on the fact that the TRO was labeled with Rule 65(b) and not Chapter 50B, the majority also concludes that the TRO did not meet another element of the statutory definition of "protective order." "As used in [Chapter 50B], the term 'protective order' includes any order entered pursuant to [Chapter 50B] *upon hearing by the court* or consent of the parties." *Id.* § 50B-1(c) (2003) (emphasis added). As explained above, I believe the TRO was entered pursuant to Chapter 50B. The majority also asserts that the TRO fails to satisfy the definition's requirement of being entered "upon hearing by the court or consent of the parties." It is undisputed that defendant did not consent to the TRO. I disagree, however, with the majority's conclusion that the TRO was not entered after a hearing.

---

4. The General Assembly's preference in subsection 50B-4.1(d) for the greatest possible punishment under the law for felons who violate protective orders demonstrates the strength of the legislative intent to deter domestic violence. I believe the majority's approach is inconsistent with that intent.

The TRO begins with the following language: "This cause coming on to be *heard* before the undersigned District Court Judge . . . ." (emphasis added). In addition, the trial court granted the TRO only after "having considered the verified Complaint, Motion, and Affidavit herein filed by applicant." Although the hearing was *ex parte* in nature, the TRO was nonetheless granted after a hearing. The majority's assertion to the contrary is due to the fact that the hearing was not fully adversarial: there was no notice to defendant and no opportunity for defendant to be heard prior to entry of the TRO. Nowhere does the statutory definition of "protective order" require a full adversarial hearing, however. The order must simply be entered "upon hearing by the court or consent of the parties." *Id.* Thus, this element of the definition excludes neither *ex parte* protective orders under section 50B-2(c) nor Rule 65(b) orders entered upon a section 50B-2(a) motion.

The inclusion of *ex parte* hearings within the meaning of "upon hearing by the court" is especially plausible in light of the fact that section 50B-2 itself explicitly recognizes the existence of *ex parte* hearings. When a party seeks emergency relief *ex parte* as Carrie did here, an *ex parte* hearing before the trial court is available. *See* N.C.G.S. § 50B-2(c) ("If an aggrieved party acting pro se requests ex parte relief, the clerk of superior court shall schedule an ex parte hearing with the district court division of the General Court of Justice within 72 hours of the filing for said relief, or by the end of the next day on which the district court is in session in the county in which the action was filed, whichever shall first occur."). The statutory definition of "protective order" contained in the very same chapter does not exclude orders entered after such *ex parte* hearings, nor does it otherwise qualify the hearing requirement. *Id.* § 50B-1(c). I would therefore conclude that a section 50B-2(c) *ex parte* hearing satisfies the definition's hearing element, as does an *ex parte* hearing conducted under Rule 65(b) when the resulting TRO is a Chapter 50B protective order. As the Court of Appeals aptly stated, "To hold otherwise would allow one who had notice that an *ex parte* Chapter 50B order had been entered against him a ten-day window in which to continue acts of domestic violence against the party who sought the order, while avoiding the corresponding sentencing enhancement provided in Chapter 50B." *State v. Byrd,* 185 N.C. App. 597, 603, 649 S.E.2d 444, 449 (2007) (footnotes omitted). Like the Court of Appeals, I doubt the legislature intended this result.

After concluding that the TRO in this case does not satisfy the statutory definition of "protective order," the majority goes on to

address the constitutional issue of whether defendant's right to due process of law would be violated by the imposition of an enhanced sentence on the basis of an *ex parte* order. This approach is in conflict with the "longstanding principle" that "appellate courts must 'avoid constitutional questions, even if properly presented, where a case may be resolved on other grounds.' " *James v. Bartlett*, 359 N.C. 260, 266, 607 S.E.2d 638, 642 (2005) (quoting *Anderson v. Assimos*, 356 N.C. 415, 416, 572 S.E.2d 101, 102 (2002) (per curiam)). Because the majority purports to decide this case on statutory grounds, it is unnecessary to consider the more momentous constitutional question.

I also have strong misgivings as to whether the constitutional issue is properly before this Court. The record does not reflect that defendant made any constitutional argument to the trial court, and defendant did not specifically raise his due process rights in his briefs to the Court of Appeals or to this Court. The majority reaches the due process issue based on defendant's contention that an *ex parte* order is not "sufficiently reliable to justify enforcement by criminal penalties." This assertion is found in the context of defendant's statutory argument that the TRO does not constitute a Chapter 50B protective order, and while this isolated statement may vaguely implicate due process, defendant cites no authority for the unstated proposition that imposing an enhanced sentence on the basis of an *ex parte* order would deprive defendant of a liberty interest without due process of law. "It is not the role of the appellate courts . . . to create an appeal for an appellant," *Viar v. N.C. Dep't of Transp.*, 359 N.C. 400, 402, 610 S.E.2d 360, 361 (2005) (per curiam), so I hesitate to wade into constitutional waters when the issue has not been fully briefed and argued by the parties.

Because the majority reaches the due process issue, however, I am compelled to respond. In general, to deprive defendant of a liberty interest on the basis of court proceedings of which he had no prior notice, and in which he had no opportunity to appear in his own defense, could raise questions regarding defendant's right to due process of law. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 657, 94 L. Ed. 865, 873 (1950) (citations omitted). This case is an exception to the general rule, how-ever. In its 11 March 2004 order granting Carrie's motion for a TRO, the trial court set 15 March 2004 as the date for a full adversarial hearing on the matter. Defendant was properly served with the TRO on 12 March 2004. On 15 March 2004, defendant's counsel moved for and was granted a continuance until 24 March 2004. Defendant was thus partly respon-

sible for, and fully aware of, the fact that the TRO remained in effect when, on 23 March 2004, he went to Carrie's place of work and flagrantly violated the court's order by shooting Carrie in the head.

By moving for a continuance, defendant postponed both his own opportunity to be heard and the trial court's opportunity to enter an order that would have removed any constitutional concerns over the enhancement of defendant's sentence. Further, had defendant not engaged just one day before the rescheduled hearing in the very conduct he had been ordered to avoid, he would have had the opportunity for a hearing to satisfy the trial court that he had not been committing acts of domestic violence. "Even a constitutional right may be waived 'by conduct inconsistent with a purpose to insist upon it.'" *State v. Langford*, 319 N.C. 332, 338, 354 S.E.2d 518, 522 (1987) (quoting *State v. Hutchins*, 303 N.C. 321, 342, 279 S.E.2d 788, 801 (1981)). Defendant should not now be heard to complain of his lack of opportunity to contest the allegations of domestic violence when he himself delayed the hearing by seeking a continuance and then conducted himself in a manner egregiously inconsistent with any claim that he was not violent toward Carrie. I would hold that defendant waived his right to contest the allegations of domestic violence and thus was not prejudiced by the enhancement of his sentence based on his violation of the *ex parte* TRO.

By requiring enhanced sentences under section 50B-4.1 of the General Statutes, the General Assembly demonstrated a clear intent to deter violations of court orders aimed at the prevention of domestic violence. Although the TRO in this case had just such an objective and resembled a section 50B-2(c) *ex parte* protective order in everything but name, the majority refuses to give effect to the intent of section 50B-4.1 because the applicant for domestic violence relief failed to explicitly invoke Chapter 50B in her motion. I do not believe the General Assembly intended Chapter 50B to be interpreted so inflexibly. Neither do I believe the legislature intended to allow a defendant who is subject to an *ex parte* protective order to use the time before the full adversarial hearing to knowingly violate the *ex parte* order without facing enhanced sentencing. In my view, Chapter 50B should be read broadly in favor of protecting endangered spouses and children, rather than narrowly in favor of defendants who commit crimes in knowing violation of court orders. I find no error in defendant's sentencing and therefore respectfully dissent.